# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

GREGORY BROWN                                        CIVIL ACTION

VERSUS

BURL CAIN                                            NO. 09-924-D-M2

## NOTICE

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the United States District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have 14 days from the date of service of this Notice to file written objections to the proposed findings of fact and conclusions of law set forth in the Magistrate Judge's Report. The failure of a party to file written objections to the proposed findings, conclusions, and recommendation contained in a Magistrate Judge's Report and Recommendation within 14 days after being served with a copy of the Report shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions of the Magistrate Judge that have been accepted by the District Court.

**ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.**

Signed in chambers in Baton Rouge, Louisiana, November 22, 2011.

_____

**MAGISTRATE JUDGE CHRISTINE NOLAND**

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**GREGORY BROWN**                                     **CIVIL ACTION**

**VERSUS**

**BURL CAIN**                                          **NO. 09-924-D-M2**

## MAGISTRATE JUDGE'S REPORT

This matter is before the Court on the Petition for Writ of Habeas Corpus (R. Doc. 1) and the Amendment to Petition for Writ of Habeas Corpus (R. Doc. 4) filed by petitioner, Gregory Brown ("Brown").  Due to the complicated procedural history of this case, both the State and Brown have filed several responsive briefs.[1]

## FACTS & PROCEDURAL BACKGROUND

According to the record in this matter, on the afternoon of October 4, 1998, several men (one of which the State contends was Brown) drove a van from Baton Rouge to Clinton to rob a drug dealer named "Little Man."  One of the men in the van, Jonathon Booth ("Booth"), went to the house believed to be occupied by Little Man but instead found Davy Thompson, a security guard about to leave for work.  A struggle ensued between Booth and Davy Thompson, which ended in Thompson being shot in the leg.  The men in the van fled from the home and were involved in an automobile accident, from which they also fled on foot.

---

[1] The State filed its original opposition (R. Doc. 26), a sur-reply memorandum relating to certain issues upon which the undersigned ordered additional briefing (R. Doc. 36), and a response to the claims raised in Brown's proffer (R. Doc. 44).  Brown filed a reply (R. Doc. 32) to the State's opposition, a sur-reply memorandum (R. Doc. 39) on the additional issues that the undersigned ordered to be briefed, and a reply (R. Doc. 47) to the State's response to the claims asserted in his proffer.

Three (3) of the men who fled, allegedly Brown, Elderich Thompson ("Thompson"), and Brian Williams ("Williams"), came out of the woods into which they had fled and approached a man working in a barn in Clinton, who was named Ikie Roberts ("Roberts"). The men asked Roberts if he would take them to Baton Rouge and offered him money if he would do so, but Roberts declined. The men also asked Roberts to call a cab for them, but he told them there was no cab service in the area. Roberts was then tied up and beaten with a hammer until two of the men got into Roberts' truck and drove off, leaving the third man (allegedly Brown) behind at the scene. According to Roberts, the third man then ran off.

In a statement given to police following his arrest related to the above events, Brown admitted to being in Clinton on October 4, 1998, and that he went there with a number of men in his van to rob "Little Man." He, however, indicated that he waited in the van during the skirmish at the house believed to be that of "Little Man" and stated that he was not involved in the subsequent beating and robbery of Roberts. He stated that, after the van crashed and the men fled the accident scene on foot, he lagged behind three other men because he was caught in barbed wire and lost his wedding ring. According to Brown, when he did not find his wedding ring, he went to the house of an elderly white woman and tried to get her car but left when he was unable to find car keys. He said that he then ran through a wooded area behind her house until he came to Plank Road, where he secured a ride to Baton Rouge.

In connection with the above events, Brown, Thompson, and Williams were charged by bill of information with the attempted second degree murder and armed robbery of Roberts, in violation of La. R.S. 14:27, 14:30.1, and 14:64, in the 20th Judicial District Court,

Parish of East Feliciana, State of Louisiana. Brown was formally arraigned on January 12, 1999 and pled not guilty to the charges against him.[2] Following a jury trial on April 13-14, 2000, Brown was found guilty as charged. On June 27, 2000, he was sentenced to fifty (50) years imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence on each of the charges against him, with the sentences to be served consecutively to each other.

The rather complicated procedural background of Brown's direct appeal and post-conviction proceedings is discussed at length in the undersigned's prior Reports and Recommendation dated July 16, 2010 and February 22, 2011 (R. Docs. 20 and 41). Brown filed his present, original habeas petition on October 26, 2009 and his amended habeas petition on December 23, 2009. In those petitions, he raises the following claims: (1) jury misconduct polluted his trial and rendered the verdict unworthy of confidence in violation of his rights to a jury trial, confrontation, and a fair trial because: (a) one of the seated jurors materially misrepresented her personal relationship with petitioner during voir dire and inaccurately informed other jurors during deliberations that petitioner had been previously committed to a mental institution where he committed arson and held a guard at gunpoint, causing the guard to die of a heart attack, (b) the participation of a non-juror in deliberations constituted unconstitutional extrajudicial contact in violation of petitioner's right to a trial by jury under the 6th and 14th Amendments, and (c) the cumulative effect of jury misconduct requires reversal of petitioner's conviction and a new trial; (2) ineffective assistance of counsel because: (a) his trial counsel failed to object to erroneous jury

---

[2] Williams pled guilty in advance of trial.

instructions on the critical element of intent, (b) his trial counsel failed to investigate and prepare for trial, (c) his trial counsel failed to properly litigate the change of venue, (d) his trial counsel failed to properly litigate the motion to suppress identification, (e) his trial counsel failed to properly litigate the motion for severance, (f) his trial counsel has a history of failing to prepare for trial, (g) his appellate counsel rendered ineffective assistance in several ways, and (h) the cumulative effect of the ineffective assistance of counsel violated Brown's rights; (3) prosecutorial misconduct violated petitioner's rights because: (a) the prosecution withheld crucial impeachment evidence, (b) the prosecution withheld evidence that would have corroborated petitioner's defense theory, (c) the prosecutor suppressed information regarding his personal relationship with the victim, and (d) petitioner's failure to state specific facts to support his claim during post-conviction proceedings in state court was not an adequate reason to deny relief, and the state court should have granted him a hearing; (4) petitioner's right to testify was violated; (5) petitioner was convicted based upon a non-unanimous verdict of 11-1 in violation of his rights to a jury trial and due process; and (6) denial of the presumption of innocence by the use of excessive security measures, which undermined the fairness of the fact-finding process and exposed the jury to unjustified indications that he posed a safety risk.

The Court previously determined that Brown's habeas petition was timely-filed and that all claims were exhausted in the state court system, except for his claim concerning the non-unanimous nature of his verdict.[3] Accordingly, the merits of the claims contained

---

[3] Brown conceded that his non-unanimous verdict claim was not properly presented to the state courts and that the Louisiana Supreme Court has "recently and repeatedly affirmed the constitutionality of the non-unanimous verdict."

in Brown's original and amended habeas petitions (other than his claim regarding the non-unanimous nature of his verdict) are now ripe for consideration by the Court.

## LAW & ANALYSIS

As a preliminary matter, the undersigned notes that the standard of review applicable to Brown's original and amended habeas petitions will vary depending upon whether the particular claim at issue was adjudicated on the merits by the state courts. The undersigned previously determined that a portion of Brown's claims, which were asserted in his "Proffer in Support of Application for Post-Conviction Relief" filed on March 11, 2008 ("proffer"), were dismissed by the state courts on procedural grounds and were not considered on the merits. As a result, those claims will be subjected to *de novo* review in this Court.[4] *Hatten v. Quarterman*, 570 F.3d 595 (5th Cir. 2009)("In absence of state court adjudication on the merits of habeas petitioner's claim, to which AEDPA requires deference, a district court's findings of fact are reviewed for clear error and its legal conclusions are reviewed *de novo*").[5]

As to the remaining claims asserted in Brown's habeas petition(s) that were adjudicated on the merits by the state courts, those claims are governed by the deferential standard of review set forth in 28 U.S.C. §2254, as amended by the Antiterrorism and

---

[4] Brown is correct in arguing, in his final reply memorandum, that federalism and comity concerns do not require this Court to defer to the state courts' findings concerning his proffer, where the state courts denied his proffer claims without considering the merits of same and on procedural grounds that do not constitute independent and adequate state procedural grounds for denying habeas review. *See also,* Report & Recommendation dated February 22, 2011, R. Doc. 41, p. 12; *Lewis v. Horn*, 581 F.3d 92 (3rd Cir. 2009).

[5] Additionally, as discussed below, relative to Brown's claim of ineffective assistance of counsel due to his counsel's alleged failure to litigate a motion for severance, the undersigned previously determined that the state district court unreasonably determined the facts in light of the evidence concerning that claim, and such claim is therefore also subject to *de novo* review. *See*, 28 U.S.C. §2254(d)(2), discussed *infra*.

Effective Death Penalty Act of 1996 ("AEDPA"). In order for the Court to grant his habeas application relative to any of those claims, the Court must find that adjudication of such claim: (1) resulted in a decision that is contrary to, or involves an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that is based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(1) and (d)(2). AEDPA limits, rather than expands, the availability of habeas relief. *See, Fry v. Pliler*, 551 U.S. 112, 119, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007); *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). "By its terms §2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. –, 131 S.Ct. 770, 784, 178 L.Ed.2d 624 (2011). "This is a 'difficult to meet,' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court rulings be given the benefit of the doubt'." *Cullen v. Pinholster*, 563 U.S. –, 131 S.Ct. 1388, 1398, – L.Ed.2d – (2011)(quoting *Harrington v. Richter*, 131 S.Ct. at 786 and *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002)(per curiam)).

Under the "contrary to" clause, a federal court may grant the writ of habeas corpus if the state court either arrives at a conclusion opposite to that reached by the U.S. Supreme Court on a question of law or decides a case differently from the U.S. Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. at 412-13; *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir. 2000). Under the "unreasonable application" clause, a federal court may grant a writ of habeas corpus if the state court either unreasonably applies the correct legal rule to the facts of a particular case or

unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Williams*, 529 U.S. at 407. The standard for determining whether a state court's application was unreasonable is an objective one and applies to all federal habeas corpus petitions which, like the present case, were filed after April 24, 1996, provided that they were adjudicated on the merits in state court. *Lindh v. Murphy*, 521 U.S. 320, 327, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).[6][7]

**(A)     Claim No. 1 - Jury misconduct violated right to jury trial, right to confrontation, and right to fair trial:**

In this claim, Brown sets forth three (3) contentions of juror misconduct that allegedly violated his constitutional rights. First, he contends that one of the seated jurors, Jerry Lee

---

[6] In the context of habeas corpus, "adjudicated on the merits" is a term of art referring to a state court's disposition of a case on substantive rather than procedural grounds. *Green v. Johnson*, 116 F.3d 1115, 1121 (5th Cir. 1997). Federal habeas review of claims adjudicated on the merits in state court is limited to the record that was before the state court. "[E]vidence introduced in federal court has no bearing on §2254(d)(1) review. If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of §2254(d)(1) on the record that was before that state court." *Pinholster*, – U.S. –, 131 S.Ct. at 1400, – L.Ed.2d –. Relief under 28 U.S.C. §2254(d)(2) requires a showing that the state court adjudication constituted "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *McCarthy v. Thaler*, 2011 WL 1754199 (N.D.Tex. 2011).

[7] "In cases where an applicant for federal habeas relief is not barred from obtaining an evidentiary hearing by 28 U.S.C. §2254(e)(2), the decision to grant such a hearing rests in the discretion of the district court." *Feldman v. Thaler*, 2011 WL 16666937 (N.D.Tex. 2011), quoting *Schriro v. Landrigan*, 550 U.S. 465, 468, 127 S.Ct. 1933, 1937, 167 L.Ed.2d 836 (2007). Prior to the AEDPA, "[w]hen there is a factual dispute, [that,] if resolved in the petitioner's favor, would entitle [him] to relief and the state has not afforded the petitioner a full and fair evidentiary hearing, a federal habeas corpus petitioner [was] entitled to discovery and an evidentiary hearing." Id., at *12, quoting *Goodwin v. Johnson*, 132 F.3d 162, 178 (5th Cir. 1997). In *Schiro*, the Supreme Court observed that, while the basic rule has not changed, the standards for granting relief have:

> In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief. Because the deferential standards prescribed by §2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate.

*Schiro*, 550 U.S. 474, 127 S.Ct. at 1940, 167 L.Ed.2d 836 (footnote omitted)(internal citations omitted).

("Lee"), materially misrepresented her personal relationship with him during voir dire and then inaccurately informed the other jurors, during deliberations, that Brown had been previously committed to a mental institution where he committed arson and held a guard at gunpoint, causing the guard to die of a heart attack. Secondly, Brown asserts that the participation of a non-juror in the jury deliberations constituted an unconstitutional extrajudicial contact that was in violation of his right to a trial by jury. Finally, he argues that the cumulative effect of the alleged jury misconduct on his case requires a reversal of his conviction and a new trial.

As to Brown's first contention, the primary evidence that he submits to support his assertion of jury misconduct is an affidavit by Zachary Orjuela ("Orjuela"), a non-juror. *See*, Exhibit 13 to Proffer. Orjuela, an investigator who worked on Brown's case, attests that he met with the juror in question, Lee, and she told him that, at the time of her jury service, she was thoroughly familiar with a man named Greg Brown from her employment at Feliciana Forensics (an institution for the insane); that, during her tenure at Feliciana Forensics, Greg Brown had engaged in a number of disruptions and acts of violence, including holding a gun to a security guard, which she believed caused the guard to have a heart attack; and that the other jurors were reluctant to convict Brown until she revealed that she knew of his behavior at Feliciana Forensics, at which point those jurors agreed to find Brown guilty. *Id.* Orjuela's affidavit, however, does not serve as competent evidence in support of Brown's habeas petition because it consists solely of inadmissible hearsay. *See, You v. Bennett*, 2003 WL 21847008 (E.D.N.Y. 2003)(holding that hearsay allegations of juror misconduct did not amount to "clear and incontrovertible" evidence required to authorize post-verdict inquiry as to why a hold-out juror changed her mind. Federal habeas court held that state court's summary denial of the defendant's motion to set aside the verdict based upon such

hearsay allegations was neither contrary to nor an unreasonable application of clearly established federal law as determined by the Supreme Court).[8]

Brown also refers to the affidavits of two jurors, Donna Chance ("Chance") and Andrew Veillion ("Veillion"), and that of an alternate juror, Yusuf Abdullah ("Abdullah"), and contends that those affidavits corroborate the information contained in Orjuela's affidavit regarding the statements Lee allegedly made about Brown during jury deliberations. The undersigned disagrees. While all three of those individuals indicate that there was a particular female, African American juror who was outspoken about her belief that Brown was guilty, neither Chance, Veillion, nor Abdullah specifically identify that juror as being Lee,[9] nor do they indicate that such juror made any of the statements regarding Brown attested to in Orjuela's affidavit.[10] Furthermore, those affidavits do not suggest in any way that the decision to find Brown guilty was based upon any juror's statements about prior acts or misconduct by Brown. Instead, the affidavits suggest that the jury's decision to find Brown guilty was made quickly based upon the evidence presented at trial and that the longer portion of the deliberations related to sentencing issues and/or to determining

---

[8] *See also, Maxwell v. Quarterman*, 2008 WL 3200672 (W.D.Tex. 2008)(holding that affidavits by petitioner's family members as to alleged juror misconduct would have constituted inadmissible hearsay that could not support petitioner's burden of proving his ineffective assistance of counsel claim upon habeas review); *Novelo v. Yates*, 2009 WL 2578925 (C.D.Cal. 2009)(holding that no admissible evidence of juror misconduct had been presented in a habeas case where the only evidence submitted was a declaration containing hearsay evidence of juror misconduct).

[9] According to other evidence in the record, it appears that there were several African Americans on the jury. *See*, Veillion's affidavit, Exhibit 6 to the proffer (noting that there were "many black people" on the jury).

[10] In her affidavit, Chance attests that all of the jurors knew Brown personally; that "one female African American juror said upon entering deliberations, 'Let's get him for what we can and go home;" and "other jurors agreed that [Brown] was crazy." *See*, Exhibit 12 to proffer. In his affidavit, Veillion states that there was an African American female juror that "wanted to hang the 'one-eyed one," and Abdullah attested that "one African-American woman was particularly outspoken on [Brown's] guilt." *See*, Exhibits 6 and 2 to proffer.

whether Brown's co-defendant was guilty.[11]   It seems odd to the Court that, if Brown's

investigator indeed met with Lee and she provided him with the information attested to in

Orjuela's affidavit, Lee did not simply provide Orjuela with her own affidavit in that regard.[12]

Without that affidavit or more specific information supplied directly from the other jurors

about the alleged statements made by Lee, the undersigned cannot find that Brown has

presented competent evidence of the alleged juror misconduct by Lee sufficient to warrant

an evidentiary hearing or sufficient to find that the state court's decision summarily denying

that claim was improper.

In Brown's second claim of juror misconduct, he contends that the alternate juror,

Abdullah, participated in his jury deliberations in violation of his right to a trial by a jury of

twelve (12) members.  Abdullah's affidavit indicates that he was present during the jury's

deliberations.  It further suggests that he participated in the jury's decision to convict Brown,

by stating that "*we ultimately decided* [the defendants] were equally guilty of the beating."

*See*, Exhibit 2 to the proffer [Emphasis added].  Abdullah also states that he "was part of

---

[11] Abdullah attests that "[i]t was not difficult to establish Mr. Brown's guilt, as it was well-known by all jurors that he both beat Ikie Roberts and abducted and murdered the elderly couple next door, the Gays.  It was more difficult to determine the sentences for each [d]efendant, but I knew they were all there, and we ultimately decided they were equally guilty of the beating."  *See*, Exhibit 2 to the proffer.  Veillion also stated that "Ike Robertson's [sic] sureness about Brown convinced me that he was guilty.  The State did a good job telling what happened . . . The jury didn't take long to decide that Brown was guilty . . . We spent most of the time deliberating about the younger guy.  We were immediately sure that Brown was guilty."  *See*, Exhibit 6 to the proffer.  Considering such statements by a juror and an alternate juror, who alleges to have been present during deliberations, it appears that, even assuming Brown had competent evidence that Lee made the statements attested to in Orjuela's affidavit, those statements did not prejudice him since the jury nevertheless quickly reached the conclusion that Brown was guilty based upon evidence the State produced at trial.

[12] It would be too late at this point for Brown to present an affidavit by Lee, attesting to the statements she allegedly made during jury deliberations, since Brown was obviously aware of such alleged statements at the time that he presented his post-conviction claims to the state courts (considering that he produced Orjuela's affidavit at that time), and Brown nevertheless failed to submit competent evidence supporting this claim to the state courts for review.

the deliberations" and that "we were never sequestered as the jury."[13] Such statements by

Abdullah, however, are directly contradictory to information contained in the official state

court record of this case, which indicates that the jury "retired at 12:09 A.M." to deliberate[14]

and that, after the jury retired, the trial judge spoke to the alternate jurors, who remained

in the courtroom as follows:

> Mr. Yuslf [Abdullah] and Mr. Bosworth, unfortunately, or fortunately, I don't know how you view this, but uh this is the end of your responsibilities in this case. The uh, the alternates serve until the jury retires and if it hasn't been necessary to replace somebody then you don't go in with them. And uh we do appreciate your service, yesterday and today, you are discharged. You're free to stay and see what the jury does or you can go home. Thank you. And we'll be at ease until the jury returns.

*See*, State Court Record, pp. 828-29. The record then reflects that the court was "at ease"

beginning at 12:10 p.m. until the jury was "returned to the courtroom at 12:45 p.m." with a

question for the judge. *Id.*, p. 829. According to the record, after the trial judge answered

the jury's question, the jury was again retired to another room at 12:50 p.m., until 1:41 p.m.

when the jury "returned to the courtroom" for the verdict to be read. *Id.*, p. 830.

In *United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993),

the U.S. Supreme Court held that no structural error occurs where alternate jurors are

permitted to be present but not participate in jury deliberations. Here, the official record

reflects that the state trial judge told the alternate jurors, after the jury retired to deliberate

---

[13] Although Brown also refers to an Exhibit 16 to his proffer as being a statement by the other alternate juror, Frank Bosworth ("Bosworth"), which corroborates Abdullah's statement that the trial judge did not dismiss one of the alternates, such identified exhibit is not an affidavit by Bosworth. It is, instead, another statement by Orjuela, which simply indicates that Bosworth was an alternate juror and that Bosworth told Orjuela that, during the trial, jurors sometimes saw Brown wearing his prison garb. As such, Exhibit 16 does nothing to support this claim of juror misconduct.

[14] *See*, State Court Record, p. 828 (where the state trial judge requested that the Sheriff retire the jury, and the record indicates that the jury was retired at 12:09 a.m.).

in another room, that their responsibilities and service in the case were complete; that, since it had not been necessary for them to replace any of the jurors, they were not to go with the jury for deliberations, and that they could either leave or stay and "see what the jury does."[15] The trial judge did not inform the alternates that they could participate in the jury's deliberations in any manner. Accordingly, pursuant to *Olano*'s holding, this claim lacks merit. *See, Jones v. Bradshaw*, 489 F.Supp.2d 786 (N.D. Ohio 2007)(Habeas petition asserted that the trial court's decision to permit alternate jurors to sit in on jury deliberations constituted error warranting habeas relief. The court held that the petitioner failed to properly preserve the claim because he did not raise it during his state court proceedings, and further held that, even if the claim had been properly preserved, it would not be well-taken, based on *Olano*, since the trial judge admonished the alternate jurors not to participate "in any fashion whatsoever, in the jury deliberations").

Additionally, even if it is assumed that Abdullah was present and somehow participated in the jury's deliberations, contrary to the trial judge's instructions, Brown is not entitled to habeas relief because he has failed to demonstrate "actual prejudice." Specifically, although Abdullah attests in a general and conclusory manner that he participated in the jury's deliberations and verdict, he does not indicate whether he actually contributed to the deliberations in a way that was damaging or prejudicial to Brown.[16] Furthermore, Brown has not presented evidence from any other jurors indicating that

---

[15] Considering that the record reflects that the jury had already been retired to another room to deliberate, the undersigned interprets the trial judge's statement that the alternate jurors could stay and "see what the jury does" as giving the alternate jurors permission to remain in the courtroom and see what the jury's ultimate verdict was, instead of giving them permission to watch and participate in the jury's actual deliberations, as Brown suggests.

[16] In fact, through his claim concerning the alleged non-unanimous nature of his verdict, Brown indicated (even though he waived polling of the jury as to the verdict) that the jury's vote was 11-1; thus, he concedes that a jury of twelve, rather than thirteen, actually voted to convict him.

Abdullah actually participated in deliberations and if so, the nature of such participation.[17]

Accordingly, this claim lacks merit and should be denied.

Finally, with respect to Brown's third claim of juror misconduct based upon cumulative effect, such claim must be denied because the undersigned has concluded that his other two claims of juror misconduct are insufficiently supported and subject to

---

[17] *See, United States v. Hayutin*, 398 F.3d 944, 950 (2d Cir. 1968)(finding no prejudice to defendant despite contact between alternates and jury because "nothing in the trial record . . . indicates that there was any communication between the regular and alternate jurors"); *Spears v. Ryan*, 2009 WL 2998937 (D. Ariz. 2009)(Habeas petitioner alleged his constitutional rights were violated by the jury inappropriately reviewing external material during deliberations, specifically, an alternate juror's notes taken during trial. The court held that, even if it was assumed that the alternate juror's notes were extraneous evidence, the petitioner was not entitled to a new trial because he failed to show "actual prejudice." Specifically, the only evidence that he presented was an affidavit by the jury foreperson indicating that the notes of an alternate juror were obtained by the jury and reviewed and considered during deliberations. The court found that the affidavit did not indicate that the notes contained extraneous information that was damaging or prejudicial. Additionally, the state submitted an affidavit by another juror stating that he did not review, nor did he see any other juror reviewing notes from the alternate juror); *State v. Childs*, 553 P.2d 1192, 1197-98 (1976)(discounting an affidavit from one juror impeaching the verdict because nothing in the official record indicated that the jurors were guilty of misconduct); *Olano*, at 741 (Mere presence of alternate jurors during deliberations does not entail a sufficient risk of "chill" to justify a presumption of prejudice, and retention of alternates did not mandate reversal because defendants did not make a "specific showing" of actual prejudice); *U.S. v. Yousef*, 327 F.3d 56 (2d Cir. 2003)(Defendant did not establish that retaining alternates resulted in any prejudice or affected his substantial rights because the district court kept the alternates segregated and assigned a separate marshal to oversee them. Speculation that the alternates may have communicated with jurors in transit to and from the courthouse was insufficient to establish prejudice); *U.S. v. Reynoso*, 276 F.3d 101 (1 Cir. 2002)("Among other requirements, [petitioner] must show that the alternate's presence created actual prejudice"); *Boyd v. Allen*, 592 F.3d 1274 (11th Cir. 2010)(holding that an evidentiary hearing was not warranted on a habeas claim that juror misconduct occurred when alternate juror, who was a volunteer fireman involved in search for murder victims' bodies, shared information about search with jury members during deliberations, inasmuch as no reasonable possibility of prejudice resulted, where all information conveyed by the alternate juror to one juror had already been admitted into evidence, and the defendant's suggestion that the alternate juror may have seen or shared more or talked to other jurors was "wholly speculative").

As in *Boyd*, Abdullah's assertions as to his participation in the jury's deliberations are merely conclusory and do not indicate what he shared with the jury, if anything, and how it influenced the jury's verdict, if it even did. Brown certainly had the opportunity, during his state court proceedings, to gather facts concerning Abdullah's alleged participation in jury deliberations from other jurors, but he failed to do so. As discussed above in Footnote 8, it is too late for Brown to ascertain such information from other jurors and present it to the Court on habeas review. Accordingly, the state trial court's decision on this claim is affirmed. *Boyd*, at 1306-07 ("Finally, to the extent that [petitioner] claims the state courts prevented him from developing additional facts, we remain unpersuaded - the state court may have prevented him from introducing the facts he gathered into the record, but it did not prevent him from gathering any facts in affidavit form or otherwise from [jurors]. On this scant record, we cannot say that [petitioner's] allegations amount to anything more than the merely conclusory . . . nor that the district court has abused its considerable discretion in failing to hold a hearing on this claim").

dismissal.  Moreover, claims based upon a cumulative error theory have been frequently

rejected in this circuit.  *See, U.S. v. Delgado*, 631 F.3d 685, 724 (5th Cir. 2011)(wherein the

Fifth Circuit recently discussed its preference for limiting reversals based upon cumulative

error and cited numerous cases in which it has rejected cumulative error arguments).[18]

### (B)    Claim No. 2 - Ineffective assistance of counsel:

Brown alleges that he received ineffective assistance of counsel in the following

respects:  (1) his trial counsel failed to object to erroneous jury instructions on the critical

element of intent, (2) his trial counsel failed to investigate and prepare for trial, (3) his trial

counsel failed to properly litigate the change of venue, (4) his trial counsel failed to properly

litigate the motion to suppress identification, (5) his trial counsel failed to properly litigate

the motion for severance, (6) his trial counsel has a history of failing to prepare for trial, (7)

---

[18] In *Delgado*, the Fifth Circuit explained that cumulative error justifies reversal only when errors
"so fatally infect the trial that they violated the trial's fundamental fairness."  *Id.*, at 722.  The Fifth Circuit
has repeatedly emphasized that the cumulative error doctrine necessitates reversal only in rare instances
and that its application is especially uncommon when the government presents substantial evidence of
guilt.  *Id.*  "The doctrine justifies reversal only in the unusual case in which synergistic or repetitive error
violates the defendant's constitutional right to a fair trial.  *Id.*  The court explained:

> This court has been careful to limit reversals for cumulative error because
> the doctrine is necessarily amorphous and context-specific.  It serves as
> a judicial safety valve for trials so infected by unobjected-to or harmless
> error that the reviewing court lacks faith in the jury's verdict.  It was never
> intended to correct mere imperfection.  The Federal Reporter is replete
> with cases in which we have declined to reverse for cumulative error,
> although some error did occur.  The cases in which we have reversed for
> cumulative error present strikingly different circumstances - the errors
> were either overwhelming or genuinely synergistic.
>
> * * *
>
> Discussing the cumulative error doctrine in the habeas context, this court
> recognized that it "is an infinitely expandable concept that, allowed to run
> amok, could easily swallow the jurisprudence construing the specific
> guarantees of the Bill of Rights and determining minimum standards of
> procedural due process."

*Delgado*, at 724.

his appellate counsel rendered ineffective assistance, and (8) the cumulative effect of the ineffective assistance violated his rights.

To prove ineffective assistance of counsel, Brown must meet the two-pronged burden of proof set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):

    (1)    that his counsel's performance was "deficient", *i.e.*, that counsel made errors so serious that he was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment; and

    (2)    that the deficient performance "prejudiced" his defense, *i.e.*, that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial where the result is reliable.

*Strickland*, 104 S.Ct. at 2064.[19]

## (B)(1)    Failure to object to erroneous jury instructions:

---

[19] To satisfy the deficiency prong of the *Strickland* standard, the petitioner must demonstrate that his counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional standards. (See *Martin v. McCotter*, 796 F.2d 813, 816 (5th Cir. 1986), *cert. denied*, 479 U.S. 1057, 107 S.Ct. 935, 93 L.Ed.2d 985 (1987)). The reviewing court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional competence and that, under the circumstances, the challenged action might be considered sound trial strategy. (See *Bridge v. Lynaugh*, 838 F.2d 770, 773 (5th Cir. 1988)). The court, therefore, must make every effort to eliminate the distorting effects of hindsight and to evaluate the conduct from counsel's perspective at the time of trial. *Martin*, 796 F.2d at 817. Great deference is given to counsel's exercise of his professional judgment. *Bridge*, 838 F.2d at 773; *Martin*, 796 F.2d at 816. Mere error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error has no effect on the judgment. *Strickland*, 104 S. Ct. at 2066.

If the petitioner satisfies the first prong of the *Strickland* test, his petition nonetheless must affirmatively demonstrate prejudice from the alleged errors. *Earvin v. Lynaugh*, 860 F.2d 623, 627 (5th Cir. 1988). To satisfy the prejudice prong of the *Strickland* test, it is not sufficient for the petitioner to show that the alleged errors had some conceivable effect on the outcome of the proceeding. *Strickland*, 104 S. Ct. at 2067. To prove prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*,104 S.Ct. at 2068. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id.* The habeas petitioner need not show that his counsel's alleged errors "more likely than not" altered the outcome of the case; he must instead show a probability that the errors are "sufficient to undermine confidence in the outcome." *Martin*, 796 F.2d at 816-17.

In considering Brown's post-conviction relief application, the state trial court addressed each of his various claims of ineffective assistance of counsel in detail. With respect to Brown's first allegation concerning the failure to object to erroneous jury instructions, the trial court stated:

> Subsection E involves an allegation that Mr. Young rendered ineffective assistance by failing to object to erroneous jury instructions. Petitioner claims that the definition of second degree murder which was read to the jury included the phrase "serious bodily harm." For the reasons outlined below, Subsection E is without merit. The specific instructions complained of by Brown were given during voir dire, but a correct instruction was given by the trial court at closing, which was: "Attempted second degree murder is the killing of a human being when the offender has a specific intent to kill." In *State v. Cazavox,* the trial court included a definition of second degree murder in its general charge, but explicitly instructed jurors that a conviction for attempted second degree murder required a finding that the defendant had specific intent to kill the victim. 610 So.2d 127 (La. 1992). The supreme court in *Carzavos* held the prior misstatements of law were not so pervasive that the jurors could not adhere to their charged duty. *Id.* In reaching this holding, the court considered the evidence at trial and found that any rational trier-of-fact could have determined that the defendants specifically intended to kill the victim. Likewise, the First Circuit upheld Brown's conviction on appeal, finding:

> After a careful review of the entire record, we conclude a rational trier of fact, viewing all of the evidence, both direct and circumstantial, as favorable to the prosecution as any rational fact finder can, could have determined beyond a reasonable doubt defendant was guilty of attempted second degree murder to the exclusion of any reasonable hypothesis of innocence. The defendant, Thompson, and Williams tightly tied a nylon cord around the victim's neck and pulled on the cord before hitting the victim with a hammer numerous times, including hitting him in the head with the claw of the hammer. The victim sustained lacerations and fractures, including a depressed skull fracture as a result of the attack.

> *State v. Brown*, 2001 KA-0214, p. 11 (La.App. 1 Cir. 2/15/02)(unpublished opinion)(emphasis added).

In support of his argument advanced in Subsection E, Petitioner also relies on *State v. Carter*, 559 So.2d 539 (La. App. 2 Cir. 4/4/1990). The errors complained of by Carter consisted of the following: 1) two occasions during its opening statement where the state said the intent to inflict great bodily harm was an element of attempted second degree murder; 2) five occasions during its closing statement where the state said the offense charged was committed if defendant had the intent to kill or inflict great bodily harm; and 3) the trial court, during both preliminary instructions and instructions after the close of evidence, defined the offense as including the element to commit great bodily harm. *Id.* at 540. Petitioner's case is distinguishable from *Carter* in several important respects. In Brown's case, there were absolutely no erroneous statements of law by the prosecution in either its opening statement or closing argument to the jury. Additionally, the trial court in Brown's case gave the proper instruction before the jury retired to deliberate. Counsel's failure to object to the erroneous instruction does not rise to the level of deficient performance required by *Strickland v. Washington*, 466 U.S. 668 (1984). Further, Brown was not deprived of a fair trial or prejudiced in his defense under the *Strickland* standard. On appeal, the First Circuit found the evidence to be overwhelming and, as quoted above: "a rational trier of fact . . . could have determined beyond a reasonable doubt defendant was guilty of attempted second degree murder to the exclusion of any reasonable hypothesis of innocence." *State v. Brown* (La. App. 1 Cir. 2/15/02). Again, it must be noted that Petitioner cannot have it both ways by complaining about counsel's performance after the fact, but appealing his capital case on the grounds that counsel was improperly removed.

Finally, Petitioner's argument in Subsection E is precluded by Code of Criminal Procedure article 930.4(A), which provides: "any claim for relief which was fully litigated on appeal from the proceedings leading to the judgment of conviction and sentence shall not be considered." The erroneous jury instructions were addressed by the First Circuit on appeal. The appellate court noted that even Petitioner agreed "that at the close of trial, prior to deliberations, the jury was given the proper instructions regarding attempted second degree murder." *State v. Brown* (La. App. 1 Cir. 2/15/02).

*See*, Judgment on post-conviction relief application dated June 25, 2008, pp. 4-5.

Brown's present ineffective assistance claim relating to erroneous jury instructions should be dismissed for two (2) reasons. First, it is procedurally barred since the last state court to provide a reasoned judgment concerning that claim clearly and expressly relied upon La. C.Cr.P. art. 930.4 in denying the claim.[20] [21] Additionally, even assuming Brown could receive habeas review of this claim by demonstrating that he had cause for his failure to properly preserve it in state court and that he would be prejudiced by this Court's decision not to consider it, the claim should nevertheless be denied on the merits. Brown contends that the state trial court based its denial of his ineffective assistance claim relating to erroneous jury instructions upon an unreasonable determination of the facts in light of the trial record. Specifically, he contends that the state trial court "completely ignored its subsequent reiteration of the wrong instruction in response to a jury question specifically requesting that the court reinstruct them on the elements of the offense." *See*, R. Doc. 1, pp. 26-27. Brown refers to page 829 of the trial record, at lines 4-19, where, in response to a request by the jury for clarification regarding the requisite elements of the offense of second degree murder, the court stated, "A second degree murder is the killing of a human being when the offender has specific intent to kill or when the offender is engaged in perpetration or attempted [ ] perpetration of armed robbery even though he has no intent to kill or inflict great bodily harm." *Id.* Brown argues that, because the post-conviction

---

[20] Louisiana Code of Criminal Procedure article 930.4(A) provides that "any claim for relief which was fully litigated on appeal from the proceedings leading to the judgment of conviction and sentence shall not be considered" during post-conviction relief proceedings. The state trial court alternatively found petitioner's erroneous jury instruction claim to be procedurally barred because that claim had previously been presented to the First Circuit Court of Appeals on direct appeal, and the First Circuit had declined to review the claim due to petitioner's failure to properly preserve that claim for appellate review. *See, Buxton v. Collins*, 925 F.2d 816 (5th Cir. 1991)(Claim by habeas petitioner was barred on state procedural grounds for failing to object at trial even though final state court considering claim had found state procedural bar as an alternative ground and also considered the claim on the merits).

[21] *See, Desalvo v. Cain*, 2002 WL 1585564(E.D.La. 2002)(La. C.Cr.P. art. 930.4 held to have acted as an independent and adequate state ground to preclude a claim).

court's denial of relief was "premised upon a misstatement o[f] the record, the Court need not defer to the state court's denial of the claim."  *Id.*, p. 27.

Even assuming that Brown's counsel was deficient in failing to object to the trial judge's misstatement of the elements of the attempted second degree murder charge, the undersigned nevertheless finds that Brown cannot prove that he was prejudiced by such misstatement since the evidence against him was sufficient to establish the required elements of the charge (*i.e.*, sufficient to establish that he had the specific intent to kill at the time of the offense).   In this respect, the undersigned agrees with the findings of the First Circuit on direct appeal.   Specifically, on appeal, Brown asserted that his conviction should be overturned because the State failed to present sufficient evidence of specific intent to kill.  He argued that the State's case supported nothing more than an aggravated battery charge as the defendants only tied up the victim until they got away, and when they failed, they tried to knock him unconscious.  The First Circuit explained that, although the charge of second degree murder requires proof of the specific intent to kill or to inflict great bodily harm, a conviction of *attempted* second degree murder requires a finding that the defendant had the specific intent to kill.  *See*, First Circuit's opinion dated February 15, 2002, p. 10 [Emphasis added].  The First Circuit then stated the following in finding that the State had proven that defendant had the specific intent to kill at the time of the offense:

> In the instant case, the defendant, Thompson, and Williams wrapped a nylon cord around the victim's neck 'real tight' and pulled on it.   Then, as Thompson and Williams tried to pull back the victim's hands, Brown hit the victim a number of times with a hammer.   The victim was able to block some of the blows with his hands and arms but he did sustain hits to the head.   As the men were leaving the scene, the defendant hit the victim in the head at his ear with the claw of the hammer. As a result of the attack, the victim sustained broken fingers and a broken forearm.   He also had open fractures of the forearm and a finger.   The defendant also sustained soft tissue

injuries and severe injury to his ear and scalp. According to the doctor who treated the victim, he had multiple lacerations to his scalp, his ear was severely damaged, and he had a depressed skull fracture, which is a fracture of the skull with some displacement of the bone. The victim spent four days in the hospital.

After a careful review of the entire record, we conclude a rational trier of fact, viewing all of the evidence, both direct and circumstantial, as favorable to the prosecution as any rational trier of fact can, could have determined beyond a reasonable doubt defendant was guilty of attempted second degree murder to the exclusion of any reasonable hypothesis of innocence.

*Id.*, p. 11. The undersigned finds that the First Circuit properly set forth the facts as established through evidence in the trial record and agrees with the First Circuit's assessment that a rational juror, considering those facts, would have determined beyond a reasonable doubt that Brown had the specific intent to kill Roberts at the time of the offense. Thus, even if Brown's counsel would have objected to the trial judge's misstatement of the elements of the offense of attempted second degree murder and the jury would have been correctly informed that such elements require the specific intent to kill, there still is not a reasonable probability that the outcome of Brown's trial would have been any different. Accordingly, Brown's first claim of ineffective assistance of counsel should be denied.

### (B)(2) Failure to investigate and prepare for trial:

In addressing this claim during post-conviction relief proceedings, the state trial judge stated the following:

Subsection B involves an assertion that "Mr. Young failed to investigate this fact intensive case prior to trial thus leaving Mr. Brown without a defense." Specifically, Petitioner argues that Mr. Young failed to cross-examine the victim, Ikie Roberts, regarding Brown's tracheotomy scar and failed to impeach Mr. Roberts with an audiotape of the 911 call made by his wife,

Mrs. Roberts. It is not necessary to discuss whether counsel's performance was deficient because both of these issues were addressed by the Louisiana Supreme Court in affirming his capital conviction in East Baton Rouge [P]arish. During his murder prosecution, Brown, acting in the course of "hybrid" representation, cross-examined Mr. Roberts regarding the scar and attempted to impeach him with a transcript of the 911 call. *State v. Brown*, 907 So.2d 1 (La. 2005). Despite Brown's attempts to undermine Mr. Roberts' testimony by pointing out inconsistencies in his recollection of Brown's scars, the supreme court found the "jury was within the bounds of rationality to accept the testimony of Ikie Roberts." *Id.* at 21. As for the 911 call, the supreme court noted that Brown failed to understand the rules of evidence; apparently Petitioner is still unaware that a witness cannot be impeached with statements made by another person. *Id.* at 25. In light of the supreme court's holding, Petitioner cannot show that, but for these alleged errors by his attorney, the result of his proceeding would have been different.

Petitioner also argues Mr. Young rendered ineffective assistance by failing to interview Brian Williams, who was called as a defense witness by Eldridge Thompson. Petitioner further claims "Young declined to cross-examine him despite Mr. Brown's insistence that Mr. Williams was lying." However, Mr. Young did cross-examine Williams. Perhaps more importantly, Williams testified <u>favorably</u> to Petitioner on both direct and cross examination. Although the jury may have ultimately found Williams lacked credibility, counsel clearly did not render ineffective assistance with respect to Williams' testimony.

*See*, Judgment on post-conviction relief application dated June 25, 2008, p. 3.

Brown contends herein that the state trial judge unreasonably applied federal law to this claim because he applied a "sufficiency of the evidence" standard to reject petitioner's ineffective assistance of counsel claim, whereas the "reasonable probability" standard set forth in *Strickland* should have been applied. Specifically, Brown contends that the state trial judge inappropriately denied this ineffective assistance claim "based upon the Louisiana Supreme Court's finding, in the appeal of his *capital* case – tried separately *before a different jury in a different jurisdiction*, that 'the jury [in the capital case]

was *within the bounds of rationality* to accept the [identification] testimony of [the victim/eyewitness]." *See*, Brown's original habeas petition, R. Doc. 1, p. 34.[22]

However, the undersigned finds that the state trial judge simply relied upon the Louisiana Supreme Court's finding in the *capital* case to address the "prejudice" prong of the *Strickland* analysis and therefore did not apply the incorrect legal standard. What the state trial judge found was that, even if Brown's defense counsel was deficient in failing to cross-examine Roberts concerning the tracheotomy scar and in failing to impeach Roberts with the audiotape of the 911 call made by his wife, Mrs. Roberts, Brown's case was not prejudiced by such failures since his counsel did raise those issues on cross-examination in the related capital case, and it was nevertheless determined that a reasonable juror could have accepted the identification testimony of Roberts despite inconsistencies in Roberts' recollection concerning Brown's scars and because the statements made by Mrs. Roberts in the 911 call could not be used to impeach Roberts since he did not make those statements. Put another way, Brown cannot show that, even if his attorney had challenged Roberts' identification testimony in the ways discussed above, there is a reasonable probability that confidence in the outcome of his proceeding would be undermined. Although the state trial judge did not use the buzz words "reasonable probability," the undersigned nevertheless finds that the last statement of the first paragraph in the above excerpt sufficiently applies that legal standard.

---

[22] On May 6, 2002, Brown was also convicted of two counts of first degree murder of William and Ann Gay in the 19th Judicial District Court, Parish of East Baton Rouge. He was sentenced to death in connection with those convictions, and the Louisiana Supreme Court upheld his convictions and death sentence on April 12, 2005. *See, State v. Brown*, 2003-0897 (La. 4/12/05), 907 So.2d 1. The murders of William and Ann Gay occurred on the same day as the offenses against Ikie Roberts, October 4, 1998, and were classified by the Louisiana Supreme Court as the "culminat[ion]" of a campaign of terror on that day by Brown and his counterparts. *Id.*, at *7.

Additionally, relative to Brown's argument that his counsel was ineffective in failing to interview Brian Williams, he contends that the state trial judge erred in finding that Williams testified "favorably" to the petitioner because Williams' testimony "placed Petitioner at the crime scene." While it is true that Williams indicated, during his testimony, that Brown was present at the crime scene, that fact had already been established through the testimony of other witnesses, and Williams' testimony was otherwise quite favorable to Brown. For example, when Brown's counsel cross-examined Williams, he testified that he "never saw" Brown "doing anything to Roberts." *See*, Trial transcript, p. 796. Earlier in his testimony, Brown also testified that he "didn't see nobody hold [Roberts] hand or nothing" and that, when Williams left the scene of the crime, he "ain't turned around, I ain't never see nothing" as to what Brown was doing. *Id.*, p. 789, 791. Thus, even if Williams testified that Brown was present at the scene of the crime, Williams did not provide any testimony that Brown took any act that would support the charges of attempted second degree murder or armed robbery. As a result, Brown's counsel was not ineffective in failing to interview Williams prior to trial or in cross-examining Williams.

Finally, Brown contends that his counsel was ineffective in failing to meaningfully cross-examine Ikie Roberts' wife, Mrs. Roberts. Although Brown raised this issue in his post-conviction relief application on pages 9-10, it does not appear that it was directly addressed by the state trial judge in the June 25, 2008 Judgment, in that the trial judge only specifically discussed the 911 call by Mrs. Roberts. Brown now argues that an effective cross-examination of Mrs. Roberts could have been used to impeach State witnesses and could have called the supplemental police report into question. Specifically, Brown argues that Mrs. Roberts' testimony "directly conflicts" with that of Lt. Demoss and the

supplemental police report that he prepared. Mr. Roberts testified at trial that, after his attackers left the scene, he went back to the house where he asked his wife to call 911 before he fell onto the floor. During Mrs. Roberts' testimony, the following exchange occurred:

> Q. After you called 911 Mr. Roberts was laying on the floor, what happened?
>
> A. Uh, he was laying on the floor and I had gotten word to my uh son, he came over, he came in and uh he just told him don't move and uh then a town deputy came up, Billy Demoss, and said that uh, he said that help was on the way just to be still. And that's what he did until help came.

S*ee*, Trial transcript, p. 748. Brown contends that, because Mrs. Roberts did not mention, in the above exchange, that Lt. Demoss took a statement from Mr. Roberts, which contained a description of Roberts' attackers, her testimony contradicts the following testimony by Lt. Demoss:

> On arrival at the residence I went in through the carport area and noticed the back door was open. I heard noises in there, went inside and found Mr. Roberts, Ms. Roberts, and I believe their son, Jeff, was there. Mr. Roberts was on the floor in a large pool of blood. He was conscious but he was, he was rambling on about that he had been attacked by three black males which had come out of the woods on him. And he began to tell me the story of, of how he had been attacked by these, these three black males.

*See*, Trial transcript, p. 762. Brown argues that, if his counsel had interviewed Mrs. Roberts prior to trial, he could have called attention to the "conflicting" stories of Mrs. Roberts and Lt. DeMoss.

The undersigned, however, disagrees with Brown that Mrs. Roberts' testimony and Lt. Demoss' testimony conflict with one another. While Mrs. Brown testified that her

husband laid on the floor and remained still until help arrived, at the instruction of Lt. Demoss, there is no testimony by Mrs. Brown that her husband did not give a statement to Lt. Demoss during the time period while he was laying there, as would be needed for her testimony to contradict that of Lt. Demoss. Defense counsel may have found Mrs. Brown's failure to mention her husband's statement to Lt. Demoss, describing the perpetrators of the crime, to be beneficial to petitioner's case and therefore strategically chose not to raise that issue through cross-examination of Mrs. Roberts. Defense counsel may have believed that having her potentially corroborate Lt. Demoss' testimony concerning that statement upon cross-examination would have hurt petitioner's defense.[23]  Accordingly, the undersigned cannot find that defense counsel's failure to interview and cross-examine Mrs. Roberts on the issue discussed above constitutes ineffective assistance of counsel.

### (B)(3)　　　　Failure to litigate change of venue:

Although the change of venue issue was not considered by the state courts as an ineffective assistance of counsel claim during post-conviction proceedings, it was raised, during Brown's appeal proceedings, as an assignment of error on the trial court's part and expressly denied by the First Circuit Court of Appeals as being "without merit."  In discussing that claim, the First Circuit explained that Brown ultimately dismissed his motion for change of venue because it would have been a "waste of time" to proceed forward with it since he did not receive funds from his grandparents to pay the fees of the newspaper and television station to obtain evidence concerning their news coverage of the case.

---

[23] Additionally, as mentioned above, Mrs. Roberts' cross-examination testimony could not have been used to "impeach" the testimony of other witnesses, as Brown contends.  As noted by the state trial judge, referencing the Louisiana Supreme Court opinion in the capital case, a witness can only be "impeached" by his/her own prior, inconsistent testimony.  Nevertheless, contradictory evidence could be used to discredit the State's case as a whole.

Since proceeding forward with the motion for change of venue was considered a "waste of time" by Brown, he can hardly now argue that his counsel was deficient and that his case was prejudiced by the failure to litigate that motion.  Moreover, the First Circuit pointed out that the prospective jurors were questioned, during voir dire, regarding their knowledge of and publicity regarding the case, thereby also eliminating or lessening any prejudice that might have stemmed from a failure to litigate the motion for change of venue since any individual who was connected with the victim or who felt that he or she could not be fair due to pretrial publicity was excused from service.[24]  Accordingly, the undersigned finds that this claim also lacks merit and should be denied.

### (B)(4) Failure to litigate the motion to suppress identification:

In addressing this claim, the state trial judge stated the following during post-conviction proceedings:

> In subsection C, Petitioner argues trial counsel was ineffective in failing to litigate a motion to suppress identification; based on the fact that the photo array was impermissibly suggestive and the fact that there was extensive media coverage in this case. Again, the court does not need to address whether counsel's performance was deficient because the supreme court upheld the photographic lineup used in Brown's case. *State v. Brown,* 907 So.2d 1, 16-18 (La. 2005).  Specifically, the Supreme Court found the State's identification methodology was not suggestive, nor did it lead to a substantial likelihood of misidentification.  *Id.*  As the court noted, the victim "gave a detailed description of his attacker that included distinguishing features in addition to Brown's missing eye, and was unwavering in his positive identification."  *Id.* at 17.

---

[24] While some members of the jury pool indicated that they knew witnesses whose testimony was presented at trial or that they were aware the crime had occurred, none of the jurors indicated that they could not be fair and unbiased, that they would not follow the court's instructions, or that they would not decide the case based upon the evidence presented at trial.  Moreover, challenges for cause eliminated those jurors who indicated that they could not be impartial and/or who were overly influenced by media coverage of the crime.

*See*, Judgment on post-conviction relief application dated June 25, 2008, p. 3-4.

In his habeas petition, Brown argues that his counsel was ineffective because he abandoned a motion to suppress identification that had been filed on grounds that the photo lineup was impermissibly suggestive and that there was a likelihood of misidentification. In deciding whether defense counsel was deficient in abandoning the motion to suppress, the undersigned must determine whether the Louisiana Supreme Court's decision, holding that the photo line-up in question was not suggestive and did not lead to a substantial likelihood of misidentification, was incorrect. If that holding was incorrect, then Brown's counsel should have sought to suppress the identification.

The admissibility of identification evidence is governed by a two-step test: First, the court must determine whether the identification procedure was impermissibly suggestive, and second, the court must determine whether the procedure posed a "substantial likelihood of irreparable misidentification." *U.S. v. Moody*, 564 F.3d 754, 762 (5th Cir. 2009). Only if both questions are answered in the affirmative is the identification inadmissible. *Id.* That is known as the *Brathwaite* test, as set forth in the U.S. Supreme Court case of *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). The Louisiana Supreme Court appropriately identified that two-part test in Brown's capital case, wherein it considered the identification procedure in question. It also properly explained that, in accordance with the U.S. Supreme Court's ruling in *Brathwaite*, the following factors are to be considered in determining, from the totality of the circumstances, whether a suggestive pretrial identification presents a substantial likelihood of misidentification: (1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of his prior description of the criminal; (4) the level of

certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation. *State v. Brown*, 2003-0897 (La. 2005), 907 So.2d 1, *16. The Louisiana Supreme Court then applied those factors to the identification at issue in Brown's case, stating the following:

> Applying these precepts to the present case, Ikie Roberts, who had been victimized by defendant on October 4, 1998, gave the police a detailed description of his attacker immediately following his ordeal, and reported to police that his assailant was a stocky black male with a tracheotomy scar and a missing eye. On October 5, 1998, Eddie Stewart, Clinton Chief of Police, and Captain Arkell Merritt visited Roberts in the hospital, and showed him a six-person line-up containing defendant's picture. Chief Stewart and Captain Merritt testified at the motion hearing and at trial that Roberts selected defendant's photo from the line-up 'very quickly' and without hesitation.

> Ikie Roberts testified that he has good eyesight and he obtained a good clear look at defendant during the late afternoon attack, as he was within arm's reach of defendant's face for a period of minutes. Roberts testified at trial:

> Q.   Did you make any notation about any of these three individuals?

> A.   Yes, Ma'am.

> Q.   What was that, please?

> A.   Well, I tried to recognize at the time some of the clothing and the condition, but one of them didn't have on a shirt. That was Mr. Brown. He had a shirt stuck in his back pants pocket, and I noticed that he had several scars and he was missing his right eye.

> Q.   What type of scars did he have on his body?

> A.   He had a trac. scar right here in his throat from a tracheotomy, and he has a pretty

> good size scar across his midsection
> here.

Q. Okay.  And he was missing his right eye
   entirely?

A. Yes, Ma'am.

Q. Okay.  What was his hair like that day?

A. Braids or pigtails or whatever, long, and
   he had some type of sweat band
   headband type deal around his head.

Roberts promptly relayed this description of Brown to police after the attack.  Roberts recalled that the day after the attack, he made a positive identification of defendant by photo lineup with no hesitation, stating 'I know I don't have the wrong man.'

Further, when viewing the photographic lineup itself, it is clear that the State sought fill-in subjects with vision problems.  One subject's left eye is clouded white and appears to be blind.  Another appears to have a lazy eye.  While one photograph depicts a man with no apparent ocular difficulties, the two remaining subjects appear to be droopy-eyed as though under the influence of drugs or alcohol.  In addition, all of the other subjects have comparable hairstyles, skin tone and facial hair to the defendant.

Therefore, we find that the photo line-up was fair, as the State provided fill-in subjects with similar hair, skin tone, and some distinguishing eye feature that would be reasonably comparable to that of the defendant's missing eye.

Further, assuming that a line-up where only one person is missing an eye constitutes a suggestive procedure, this Court must also inquire into whether the suggestiveness of the line-up led to a substantial likelihood of misidentification.  In the instant case, defendant fails to demonstrate that Ikie Roberts misidentified him, as the record confirms that Roberts gave a detailed description of his attacker that included distinguishing features in addition to Brown's missing eye, and was unwavering in his positive identification.  Based on the totality of the circumstances, no substantial likelihood of misidentification is present and the trial court did not err in denying the defense motion to suppress identification.

*State v. Brown*, at *17.

The Louisiana Supreme Court reasonably applied the factors articulated in *Brathwaite* and properly determined that the identification procedure used in Brown's case was not unduly suggestive. This Court has reviewed a color copy of the photographic line-up in question and agrees with the Supreme Court's assessment that, even though Brown was the only subject in the photo lineup with a missing eye, the other subjects in the line-up had similar enough hair and skin tone and a distinguishing eye feature sufficiently comparable to the defendant's missing eye, such that the identification procedure was not unnecessarily suggestive. Moreover, even assuming the photo line-up was overly suggestive, the undersigned nevertheless agrees with the Louisiana Supreme Court's conclusion that the photo identification procedure did not lead to a substantial likelihood of misidentification because Roberts had already given a description of his attacker to police prior to the photo identification, which included a description of his attacker as having a missing eye,[25] and because of the fact that Roberts was certain of his photo identification at the time it was performed.[26] [27] Accordingly, because the photo identification in this case

---

[25] Although Brown argues in his habeas petition that Mrs. Roberts' testimony, discussed above, indicates that Mr. Roberts did not give a description of the perpetrators to the police, the undersigned disagrees. As mentioned above, the mere fact that Mrs. Roberts did not mention that her husband gave a description of the perpetrators to Lt. Demoss does not mean that he did not provide such a statement. According to the police report and Lt. Demoss' testimony, Mr. Roberts informed Lt. Demoss, just after the crime, that he was attacked by three black males, the largest of which hit him with a hammer. Mr. Roberts also referred to the black male who was wielding the hammer as "the one-eyed one" in such statement.

[26] Even if the record in this case does not shed much light on Mr. Roberts' level of certainty at the time that he made the photo identification, Mr. Robert's testimony in the context of the *capital* case involving the same photo line-up apparently did.

[27] While Brown contends that, based upon Mr. Roberts' trial testimony, a week possibly passed before Mr. Roberts was shown the photo line-up from which he identified petitioner, Brown has not cited to any jurisprudence indicating that a delay of a week between the crime and the photo identification is sufficient to result in a substantial likelihood of misidentification by the victim. Furthermore, Brown

was properly obtained, Brown's counsel did not act deficiently in failing to proceed forward with a motion to suppress that identification, and even if Brown's counsel had litigated that motion, there is not a reasonable probability that Brown would have succeeded on the motion. As such, Brown was not prejudiced by his counsel's failure to litigate that motion. The state trial court's conclusion in that regard was correct and in accordance with clearly established federal law, and this claim should also be denied.

### (B)(5)    Failure to litigate motion for severance:

The state trial judge denied this claim during post-conviction relief proceedings for lack of merit on the ground that Brown's counsel was not the attorney that filed the motion for severance (instead, counsel for his co-defendant, Thompson, filed the motion) and because the motion was denied after a hearing. Review of the record, however, indicates that, on October 12, 1999, a hearing was held for motions in the case, at which time the motion for severance was to be argued, and at that time, the defense waived or abandoned the motion to sever. Accordingly, if the motion was denied, it was denied as moot, and no determination was made in state court as to the merits of such motion. Accordingly, the state trial judge's finding that Brown's counsel was not ineffective in failing to litigate the motion to sever since such motion was denied after a hearing is an unreasonable determination of the facts in light of the evidence, and this Court therefore must conduct a *de novo* review of this claim.

Brown argues he was entitled to have his case severed from that of Thompson and that his counsel was ineffective in failing to litigate a motion to sever on his behalf because

---

concedes that there is a statement written by a police officer and purportedly signed by Mr. Roberts that indicates that Mr. Roberts identified petitioner out of a photo line-up on October 5, 1998 - just one day after the crime in question.

his defense was antagonistic to that of Thompson. To assess his counsel's performance, the Court must consider the parameters under which the trials could have been severed. *Jones v. Cain*, 2010 WL 3924010, *28 (E.D.La. 2010). Pursuant to La. Code of Crim. P. art. 704, jointly indicted defendants shall be tried jointly, unless the State elects to try them separately or, upon motion of a defendant and after a contradictory hearing, the trial court satisfies itself that justice requires a severance. *Id.* To establish that justice requires a severance in Louisiana, a defendant must show by "convincing evidence" that his defense will be antagonistic to the defense offered by the other defendant. *Id.,* citing *State v. Vale*, 650 So.2d 379, 385 (La.App. 5th Cir. 1995). The Louisiana Supreme Court has recognized that persons jointly indicted are not entitled to a severance of trial as a matter of right and that the trial court's ruling lies within the discretion of the trial judge. *Jones*, at *29, citing *State v. McGraw*, 366 So.2d 1278, 1283 (La. 1978). Furthermore, the mere allegation of antagonistic defenses is insufficient; a defendant must show "actual prejudice" will result from a joint trial. *Id.* The "actual prejudice" standard requires a showing that the defendant "probably would not have been convicted had he been accorded a separate trial." *Id.* Additionally, under Louisiana law, justice does not require a severance where only the extent of participation of each defendant is at issue. *Id.*, citing *State v. Gaskin*, 412 So.2d 1007 (La. 1982); *State v. Simmons*, 381 So.2d 803 (La. 1980), *cert. denied*, 449 U.S. 1036, 101 S.Ct. 612, 66 L.Ed.2d 498 (1980). Instead, "[a] severance is necessary if the defenses of codefendants are mutually antagonistic to the extent that a codefendant attempts to place the blame on the other, causing each defendant to defend against his codefendant as well as the State." *Simms v. Cain*, 2008 WL 624073 (E.D.La. 2008), quoting *State v. Prudholm*, 446 So.2d 729, 741 (La. 1984)(citations omitted). Finally, under federal law, the

U.S. Supreme Court has held that severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993).

Brown has failed to demonstrate that he was entitled to a severance of his trial from that of Thompson under the standards set forth above. In his habeas petition, Brown argues that his primary defense was antagonistic to that of Thompson because his defense at trial was that he was not present at the scene of the crime, and Thompson's counsel's questioning of two (2) witnesses, the victim and one of the perpetrators, Brian Williams, placed Brown at the scene of the crime. Brown has failed to demonstrate, however, that the elicitation of such testimony was actually prejudicial to him sufficient to justify a severance.

First, Brown's presence at the scene of the crime had already been established through the prosecution's questioning of the victim prior to Thompson's counsel even asking the first question. Thus, the testimony elicited by Thompson's counsel in that regard was merely cumulative. Furthermore, while the testimony elicited by Thompson's counsel may have reconfirmed that Brown was at the scene of the crime, it in no way established that Brown performed any of the criminal acts alleged by the State. In fact, as discussed above, Williams' testimony was otherwise favorable to Brown in that he stated that he did not see Brown doing anything at the crime scene. Additionally, a review of the questioning of witnesses and the opening and closing arguments at trial simply does not indicate that Brown and Thompson were casting blame upon one another for the charged offenses in

an effort at exculpating themselves.[28]  Finally, Brown has not demonstrated that, if he had

been afforded a separate trial, he probably would not have been convicted.  Even if he had

been tried separately, the same evidence regarding his presence at the crime scene would

have been admissible at his separate trial.  As such, there is no basis for finding that justice

required a severance.  *Simms*, at *23.  Having failed to establish that a severance was

warranted in his case, Brown has not demonstrated that his counsel's failure to litigate a

motion for severance was deficient[29] or that he was prejudiced by the joint trial.

Accordingly, this claim should also be denied.

---

[28] Although Brown now contends in his habeas petition that his primary defense at trial was that he was innocent of the crimes of attempted murder and armed robbery because he was not present at the scene of the crime, a review of the trial record does not completely support that contention.  Brown's counsel did not provide an opening statement setting forth Brown's defenses at trial.  While Thompson's counsel did so, he did not place any blame on Brown or otherwise set forth defenses on behalf of Thompson that were contradictory to those of Brown.  Instead, Thompson's counsel simply argued that Thompson was not involved in the crime in question.  A review of the questioning of various witnesses and of Brown's closing argument at trial also indicates that Brown's primary defense at trial was not that he was actually innocent of the crime because he was not present at the crime scene but instead was focused upon a theory of misidentification by the victim (since the victim, during questioning, did not specifically identify a scar on Brown's stomach), upon the fact that there was no blood on Brown following the crime in question, and upon the issue of whether the acts of tying the victim with rope and hitting him with a hammer were acts made in an attempt to actually kill the victim, rather than to just harm him (an argument that would not have been asserted had Brown's primary defense been that he was not even present at the crime scene). During the questioning of witnesses and during closing arguments, Brown's counsel concedes that the evidence relating to Brown's presence at the scene of the crime (*i.e.*, the testimony of the victim and of one of the perpetrators involved) was "not rebutted" and instead proceeds to argue the other defenses discussed above, suggesting that Brown was not defending his case on the basis of a lack of presence at the crime scene.  Thus, Brown's current argument -- that testimony brought out by Thompson's counsel demonstrating that Brown was present at the scene of the crime is "contradictory" to his defenses and justified a severance of his trial from that of Thompson -- lacks merit.

Finally, a review of the closing arguments of Thompson does not suggest that he was attempting to cast blame upon Brown at trial.  His closing argument, like that of Brown, focused on the fact that there was no blood on Thompson after the crime and on the fact that the evidence only established that Thompson was unarmed and jumped into a stolen truck.  Neither Brown nor Thompson defended their cases by arguing that they should be exculpated because it was the other that beat and robbed Roberts.  As such, their defenses were not "directly contradictory" or "mutually antagonistic."

[29] Counsel cannot be considered ineffective for failing to file a meritless motion.  *United States v. Gibson*, 55 F.3d 173, 179 (5th Cir. 1995); *United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999).

**(B)(6)      Counsel's history of failing to prepare for trial:**

In addressing this claim during post-conviction proceedings, the state trial judge stated the following:

> In subsection A, Petitioner argues that his trial counsel, Steven Young, rendered ineffective assistance of counsel because he "has a long and troubling history of unprofessional and inadequate representation." Subsection A lacks merit. Petitioner provided more than three pages of alleged background information on Mr. Young, but failed to give any specific allegations of deficient performance in Petitioner's case. It is important to note that Petitioner retained Mr. Young to represent him at both his trial, held in April 2000 before the 20th Judicial district Court, and Petitioner's capital murder trial, held in May 2002 before Judge Richard D. Anderson in the 19th Judicial District Court. Because Brown alleged ineffective assistance of counsel in East Feliciana [P]arish proceedings, Judge Anderson found there was an obvious conflict and removed Young as one of Brown's attorneys of record in the East Baton Rouge [P}arish murder prosecution. *State v. Brown*, 907 So.2d 1, 12-14 (La. 2005). On direct appeal from his capital conviction, Petitioner argued that "the trial court arbitrarily removed his counsel of choice." *Id.* Brown cannot have it both ways. If Petitioner was unhappy with Mr. Young's representation in the 20th Judicial District, he would have no cause to later complain of Young's removal in a capital case.

*Id.*, Judgment on post-conviction relief application dated June 25, 2008, pp. 2-3.

In his habeas petition, Brown again argues that his trial counsel had "an established pattern and practice of unprofessional representation in criminal cases by the time of [his] trial," noting that his counsel had been suspended twice from the practice of law by the Louisiana Supreme Court and also sanctioned once and found ineffective on one other occasion. Brown further contends that, at the time of his trial, his counsel was in the midst of formal disciplinary proceedings initiated by a trial judge who had banned him from practicing criminal law in her courtroom. The Disciplinary Committee ultimately conducted a hearing in those proceedings and found his counsel's performance incompetent.

As the state trial judge pointed out in the above excerpt, it is true that, within this particular claim of ineffective assistance, Brown simply discusses how his counsel was incompetent in criminal cases other than his own case. An attorney's subjection to discipline, suspension, or disbarment in connection with other cases, on its own, does not render counsel's assistance *per se* ineffective.[30] Thus, this claim, by itself, does not warrant habeas relief. Although the factual allegations contained in this claim (relating to counsel's disciplinary history/background) may be relevant to Brown's other claims of ineffective assistance of counsel that allege specific acts of incompetence in Brown's case, the undersigned does not find that those background facts stemming from unrelated cases

---

[30] *See,* 1 Crim. Prac. Manual §7:15 (2010)(citing *U.S. v. Mouzin*, 785 F.2d 682, 698 (9th Cir. 1986), among other cases, and noting that "'neither suspension nor disbarment invites a *per se* rule . . . Admission to the bar allows us to assume that counsel has the training, knowledge and ability to represent the client who has chosen him.' And often the reason for the suspension or disbarment is sufficiently unrelated to the 'previously prevailing presumption of competence that no inference can be drawn of ineffective representation'"); *Ybarra v. Quarterman*, 2006 WL 2683339 (5th Cir. 2006)(Defense counsel's suspension from the practice for non-payment of taxes did not render her *per se* ineffective); *United States v. Maria-Martinez*, 143 F.3d 914, 916-917 (5th Cir. 1998)(declining to apply a *per se* ineffectiveness rule in situations involving unlicensed attorneys); *United States v. McKinney*, 53 F.3d 664, 675 (5th Cir. 1995); *Garcia v. Quarterman*, 2008 WL 379652 (S.D.Tex. 2008); *U.S. v. Mitchell*, 216 F.3d 1126 (D.C.Cir. 2000)(holding that the fact of suspension does not, in itself, render counsel ineffective under the Sixth Amendment. Rather, the rule of *Strickland* applies, requiring the defendant to meet the burden of showing deficient performance at trial that resulted in prejudice); *U.S. v. Ross*, 338 F.3d 1054, 1056-57 (9th Cir. 2003)(suspension from practice prior to start of petitioner's criminal trial is not *per se* ineffective assistance); *U.S. v. Mouzin*, 785 F.2d 682, 698 (9th Cir. 1986)(disbarment during petitioner's criminal proceedings did not violate Sixth Amendment right to effective assistance of counsel); *U.S. v. Hoffman*, 733 F.2d 596 (9th Cir. 1984)(suspension from practice does not automatically violate Sixth Amendment right to effective assistance of counsel); *Osumi v. Giurbino*, 445 F.Supp.2d 1152, 1161-62 (C.D.Cal. 2006)("to show an attorney was ineffective, the petitioner must show incompetence or ineffective[ness] in his trial, not in some unrelated proceeding"); *Hughes v. Dretke*, 412 F.3d 582, 590 (5th Cir. 2005)(refusing to establish a *per se* rule of ineffective assistance because of trial counsel's inadequate experience); *U.S. v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 2047, 80 L.Ed.2d 657 (1984)(Apart from cases involving the complete or constructive denial of counsel, "there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilty").

are sufficient to justify habeas relief in this case where all of Brown's above ineffective assistance of counsel claims have been determined to lack merit.[31]

### (C)    Ineffective assistance of appellate counsel:

The arguments asserted in Brown's *pro se* post-conviction relief application regarding this claim were quite general, alleging the following: (1) that his appellate counsel never met with him prior to filing his direct appeal; (2) that, although his appellate counsel raised five (5) issues, there were "many other issues which could have been raised;" (3) that neither his appellate counsel, his appellate counsel's co-counsel, nor any other member of his appellate counsel's investigatory staff conducted any investigation; and (4) that his trial counsel's "history and ineffective assistance of counsel [were] not even mentioned in appellate counsel's brief." In addressing those allegations during post-conviction proceedings, the state trial judge found the following:

> Petitioner acknowledges that [his appellate counsel] raised five issues on appeal, but argues "there were many other issues which could have been raised." Brown filed two *pro se* briefs with the Court of Appeal wherein he set forth numerous unnumbered arguments, many of which duplicated the assignments of error filed by his counsel. The First Circuit addressed all assignments of error and found them to be completely meritless. Regarding effective assistance of appellate counsel, the United States Supreme Court has held, "the attorney need not advance every argument regardless of merit, urged by appellant," but must play the role of an active advocate. *Evitts v. Lucey*, 469 U.S. 387, 105 S.Ct. 830, 835 (1985). The assignments which Petitioner alleges should have

---

[31] See, *Thompson v. Quarterman*, 629 F.Supp.2d 665, 680 (noting that petitioner made many accusations against his trial attorneys that, "while providing context to his ineffective-assistance claims, [did] not present actionable claims for relief." The petitioner discussed at length in his habeas petition that his trial counsel had previously been suspended by the State Bar for failing to attend to his clients. The court noted that, while trial counsel's disciplinary history "provides background that must be considered, *the Strickland inquiry does not focus on the reputation, character, or litigation history of attorneys" Strickland* "stresses counsel's representation in the particular case." Thus, "the issue is how [petitioner's] trial counsel performed in [petitioner's] trial, not in other cases").

been argued were found to be without merit by the Court of Appeal, and therefore the result of his appeal would not have been different had counsel argued these assignments. Thus, Brown has not made the requisite showing to support a claim of ineffective assistance of counsel.

Petitioner also complains that "Mr. Young's history and ineffective assistance of counsel was not even mentioned in appellate counsel's brief." As a general rule, a claim of ineffective assistance of counsel is more properly raised in an application for post-conviction relief than by appeal. *State ex rel. Bailey v. City of West Monroe*, 418 So.2d 570 (La. 1982).

*See*, Judgment on post-conviction relief application dated June 25, 2008, pp.5-6.

Although Brown asserted generally, during post-conviction proceedings, that his appellate counsel failed to raise many issues in his appeal brief, he only specifically identified one (1) issue that appellate counsel failed to assert, *i.e.*, ineffective assistance of trial counsel. The undersigned finds that the state trial judge did not unreasonably apply federal law in denying that claim for several reasons. First, Brown's appellate counsel's performance may not be deemed deficient for failing to argue a frivolous or non-meritorious claim on appeal.[32] As discussed above, each instance of ineffective assistance of trial counsel relied upon by petitioner has been shown to be without merit under the *Strickland* test; therefore, appellate counsel's failure to raise that claim on appeal cannot be deemed deficient. *Id.*[33] Secondly, petitioner's ineffective assistance of trial counsel claim was

---

[32] *Jones v. Wilkinson*, 2009 WL 2986414, *11 (W.D. La. 2009), citing *Kimmelman v. Morrison*, 477 U.S. 365, 375, 106 S.Ct. 2574, 2583, 91 L.Ed.2d 305 (1986) and *Smith v. Robbins*, 528 U.S. 259, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000).

[33] When considering a claim that appellate counsel failed to raise an arguably valid state law argument on appeal, the habeas court is to look to the merits of the omitted issue. *Id.*, citing *Hammon v. Ward*, 466 F.3d 919 (10th Cir. 2006). If the omitted issue is meritless, then counsel's failure to raise it does not amount to constitutionally ineffective assistance; if the issue has merit, the court then must determine whether appellate counsel's failure to raise the claim on direct appeal was deficient and prejudicial. *Id.*, citing *Hawkins v. Hannigan*, 185 F.3d 1146 (10th Cir. 1999) and *Brown v. Sirmons*, 415 F.Supp.2d 1268 (N.D.Okla. 2006). Generally, only when ignored issues are clearly stronger than those presented on appeal will the presumption of effective assistance of appellate counsel be overcome. *Id.*, citing *Link v.*

ultimately presented to and rejected by the Louisiana First Circuit Court of Appeals and the Louisiana Supreme Court during post-conviction proceedings; thus, even if counsel's failure to raise the claim on direct appeal could be considered deficient, petitioner cannot show prejudice because the exact allegations of ineffective assistance of counsel were ultimately rejected by the state appellate courts during the post-conviction phase. *Id.* Finally, under Louisiana law, it has been recognized that claims of ineffective assistance of trial counsel are more properly raised in an application for post-conviction relief in the district court than on appeal. *Id.*, citing *State v. Lockhart*, 629 So.2d 1195 (La. App. 1 Cir. 10/15/1993), writ denied, 94-0050 (La. 4/7/94), 635 So.2d 1132.[34] In fact, Louisiana courts have consistently refused to consider ineffective assistance of counsel claims on direct appeal deferring them instead to post-conviction review. *Orange v. Cain*, 2009 WL 938909 (E.D.La. 2009), citing *State v. Smothers*, 836 So.2d 559 (La. App. 5th Cir. 2002); *State v. Hall,* 843 So.2d 488 (La. App. 4th Cir. 2003); *State v. Griffin*, 839 So.2d 1148 (La. App. 3d Cir. 2003). As such, Brown's appellate counsel either did not act deficiently in failing to raise the ineffective assistance of trial counsel claim on appeal, or even if his failure to do so could be considered deficient, Brown was not prejudiced by such failure since the state appellate courts likely would have refused to consider it on direct appeal and would have deferred such claim to post-conviction review. Neither of Brown's remaining allegations of ineffective assistance of appellate counsel that he asserted in his post-conviction relief

---

*Luebbers*, 469 F.3d 1197 (8th Cir. 2006). When appellate counsel competently asserts some claims on a defendant's behalf, it is difficult to sustain an ineffective assistance claim based on allegations that counsel was deficient for failing to assert some other claims; because one of appellate counsel's important duties is to focus on those arguments that are most likely to succeed, counsel will not be held to be ineffective for failure to raise every conceivable issue. *Id.*

[34] *Roca v. Cain*, 2008 WL 5611801 (E.D.La. 2008), citing *State v. Watson*, 817 So.2d 81 (La. 2002) and *State v. Truitt*, 500 So.2d 355, 359 (La. 1987).

application (*i.e.*, his general allegation that his appellate counsel should have raised "many other issues" on direct appeal and his allegation that his counsel should have met with him prior to filing his direct appeal) are sufficient grounds for finding ineffective assistance of appellate counsel either.

The additional claims of ineffective assistance of appellate counsel that Brown asserted in his "proffer" relate to the following three (3) issues: (1) that Brown was denied his right to confrontation/re-cross examination of Roberts by the state trial court; (2) that Brown was improperly denied funding by the state trial court for obtaining media coverage in support of his motion to change venue; and (3) that Brown was denied his right to raise certain issues on federal habeas review because his appellate counsel did not apply for writs to the Louisiana Supreme Court (even though Brown filed a *pro se* application for writs to the Louisiana Supreme Court).

Relative to the first issue, Brown explains that, during Roberts' re-direct examination, the State elicited for the first time Roberts' distinctive identification of Brown as a man with "one eye, his right eye is out" and a tracheotomy scar "right in his throat." Brown contends that, despite the fact that this description was first mentioned during Roberts' re-direct examination, the state trial judge did not allow the defense to conduct re-cross examination of Roberts, over defense counsel's objection. Brown asserts that the trial court's decision in that regard is contrary to the Confrontation Clause of the U.S. Constitution and that his appellate counsel was ineffective in failing to raise that trial court error on appeal. Brown, however, has not specifically indicated how his trial counsel could have called Roberts' identification testimony into question upon cross-examination. Instead, Brown simply states, in a conclusory manner, that he should not have been prevented from impeaching

Roberts' testimony. Without more specific information about what Brown's trial counsel could have achieved by conducting a re-cross examination of Roberts' identification testimony, the undersigned cannot conclude that Brown's Confrontation Clause argument would have been a meritorious one to assert on appeal, and as a result, cannot conclude that Brown's appellate counsel was deficient in failing to assert that argument. Moreover, even assuming Brown's appellate counsel was deficient in failing to assert the Confrontation Clause argument, Brown has not demonstrated that he was prejudiced by such failure, in that he has not established that there is a substantial likelihood that the outcome of his case would have been different had appellate counsel raised that issue on appeal. Without any evidence or argument by Brown as to the ways in which his trial counsel would have attacked the credibility of Roberts' identification testimony on re-cross examination, the undersigned cannot conclude that there is a reasonable probability (or substantial likelihood) that, if this issue had been raised on appeal, the First Circuit would have reversed his conviction.[35]

As to Brown's claim concerning appellate counsel's failure to raise the denial of funding, which would have been used to obtain media reports in support of his motion to change venue, the undersigned finds that, even if Brown could establish that his appellate counsel was deficient in failing to raise that issue on appeal, Brown again has not demonstrated that he was prejudiced thereby. As mentioned above when addressing the

---

[35] In the recent case of *Kossie v. Thaler*, 2011 WL 1659395 (5th Cir. 2011), the Fifth Circuit explained that, "[i]n addition to deficient performance, to prevail on his habeas claim, [a petitioner] must also show prejudice, which the Supreme Court has defined as "a reasonable probability that, but for his counsel's unreasonable failure . . . he would have prevailed on his appeal." *Id.*, at *5. Additionally, the Fifth Circuit reiterated that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome," which requires a "'substantial,' not just 'conceivable,' likelihood of a different result." *Id.* Furthermore, to grant habeas relief, a state court's determination that a petitioner was not prejudiced must have been "objectively unreasonable." *Id.*

motion for change of venue in the context of Brown's ineffective assistance of trial counsel claim, the failure to obtain funding and to litigate the venue motion was not prejudicial since the prospective jurors in Brown's case were questioned, during voir dire, concerning their knowledge of the crime and related publicity, and any individual who was connected with the victim or who felt that he or she could not be fair due to pretrial publicity was excused from service.

Finally, Brown's arguments concerning his appellate counsel's failure to file a writ application with the Louisiana Supreme Court during direct appeal proceedings are general and conclusory and do not establish that, if counsel had filed such a writ application, there is a "substantial likelihood" that the outcome of Brown's direct appeal proceedings would have been any different. As a result, Brown has not carried his burden of proving ineffective assistance of appellate counsel under *Strickland* and/or the standards set forth in the Fifth Circuit's recent decision, *Kossie*, and this claim should therefore be denied.

### (D) Cumulative errors of counsel:

Because none of the individual errors of his trial and appellate counsel alleged by Brown are of a constitutional dimension, the Court finds that Brown's final claim of ineffective assistance concerning cumulative error should also be dismissed. *United States v. Moye*, 951 F.2d 59, 63 (5th Cir. 1992)("Because we find no merit to any of the petitioner's arguments of error, his claim of cumulative error must also fail").

### (E) Prosecutorial Misconduct:

In his habeas petition, Brown asserts several ways in which the State allegedly violated his rights by withholding *Brady* evidence (*i.e.*, by withholding the existence of plea bargains with State witnesses, by failing to disclose that the State had located petitioner's

wedding ring in the woods behind Roberts' house (which allegedly corroborated petitioner's defense theory that he remained in the woods searching for his ring while the other men went to Roberts' barn and beat him), and by suppressing information as to the assistant district attorney's personal relationship with the victim).   Only one of those specific allegations, however, was asserted and addressed by the state courts during his post-conviction proceedings – the allegation relating to the withholding of his wedding ring.   In addressing that claim during post-conviction proceedings, the state trial judge found as follows:

> In Claim Three, Petitioner alleges there was a *Brady* violation in that the state withheld evidence, namely Petitioner's wedding ring, from the defense during discovery.  In *Brady v. Maryland*, the Supreme Court held that the suppression by the prosecution of evidence favorable to the accused violates a defendant's due process rights where the evidence is material either to guilt or punishment.  373 U.S. 83, 87, 83 S.Ct. 1194, 1196-1197 (1963).  Still, *Brady* and its progeny do not establish a general rule of discoverability.  A reviewing court determining materiality must ascertain whether the "evidentiary suppression 'undermines confidence in the outcome of the trial'."  *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566 (1995)(quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

> Petitioner has not carried his burden of proof under *Brady* and its progeny.   The only mention of the ring's existence is Petitioner's unsupported assertion.  It is noteworthy that Judge William G. Carmichael, who was prosecutor at the time of this case, has no knowledge of the wedding ring.  Even assuming the state found Brown's wedding band in the woods, the ring itself could hardly be considered exculpatory.  Petitioner claims that he left the scene of the automobile accident and went into the woods, where he caught his wedding band on a barbed wire fence.  According to Petitioner, he told the other men to go on without him while he looked for his ring, then went to Myrtle Roberts' home to try to use her truck.  The presence of the "mystery" ring in the woods does not strengthen Brown's story; at most, it simply proves Brown was in the woods adjacent to the Roberts' residence.  Thus, Petitioner has not shown that

> the disclosure of the allegedly withheld information would have
> made a different result reasonably probable.

*See*, Judgment on post-conviction relief application dated June 25, 2008, pp. 6-7.

In his present habeas petition, Brown contends that the state trial judge's above determination was an unreasonable determination of the facts and an unreasonable application of clearly established federal law. First, he argues that the state trial judge made the above finding based upon an extrajudicial contact with the former prosecutor. Specifically, Brown contends that the state trial judge had an extrajudicial conversation with Prosecutor Carmichael, in which Carmichael said that he had no knowledge of the ring. Because he was not allowed an opportunity to cross-examine Carmichael on the underlying facts, Brown contends that the state trial judge's decision was based on an unreasonable determination of the facts. Secondly, Brown argues that clearly established federal law dictates that Prosecutor Carmichael's knowledge of the existence of *Brady* material was irrelevant in determining whether a *Brady* violation had taken place.

Even assuming the two arguments asserted by Brown in his habeas petition have merit, he still cannot succeed on his *Brady* claim however. As the state trial judge noted, in order to prove a *Brady* violation, one must establish that the withheld evidence is "material to guilt or punishment," and undisclosed evidence is only "material" if there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, at 682. Thus, even if the fact that the wedding band was found in the woods behind Roberts' house was evidence favorable to Brown's case in that it corroborated his alleged defense, the undersigned agrees with the state trial judge's conclusion that, there is not a reasonable probability that the result of Brown's trial would have been different had that fact been disclosed. The existence of

Brown's wedding ring in the woods merely indicates that Brown was in the woods, and while its presence there is consistent with his defense theory, its presence there also is not inconsistent with his having committed the crime in question since Brown could have simply lost his wedding ring while running through the woods before reaching the crime scene. In *Kyles*, the U.S. Supreme Court explained that the relevant inquiry in determining whether evidence is "material" for purposes of *Brady* is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, at 435. The undersigned does not find that the existence of the wedding ring in the woods behind the victim's house puts the case in such a different light as to undermine confidence in Brown's conviction, considering the other uncontroverted evidence against him that placed him at the scene of the crime. Accordingly, his claim of prosecutorial misconduct relating to the failure to disclose the existence of his wedding ring should also be denied.

Brown's second claim of prosecutorial misconduct relates to the State's failure to disclose the existence of plea bargains with two State witnesses, Brian Rizen and Jonathan Booth. When the reliability of a given witness "may well be determinative of guilt or innocence" of the defendant, the nondisclosure of evidence affecting that witness's credibility falls within the general *Brady* rule requiring the disclosure of exculpatory evidence to the defense; such rule applies to any understanding or agreement as to future prosecution, such as the plea bargains at issue. *U.S. v. Williams*, 343 F.3d 423 (5th Cir. 2003). In this case, however, the reliability of Rizen and Booth was not solely determinative of the guilt or innocence of Brown. The State presented other witnesses who provided far stronger evidence of petitioner's guilt. Furthermore, Brown likely would not have wanted

to attack the credibility of Rizen and Booth since their testimony either was favorable to him or did not make a significant contribution to the State's case against him. For example, Rizen testified that he rode in the van with Williams, Thompson, Booth, and Brown to Clinton on the day in question, but that after they were involved in the car accident, he left the company of the others and walked down Plank Road to a car wash, where he was arrested. He testified that he did not know what happened at Roberts' house because he was not present.[36] He also testified favorably to Brown on cross-examination about the fact that Brown has a visible scar on his stomach. As to Booth, he invoked his Fifth Amendment right not to testify when called as a witness by the State, and his only testimony was that he could not remember his own name and address. Considering the lack of any significant incriminating testimony on the part of these witnesses, there is not a reasonable probability that, had the State disclosed to the defense that such witnesses had entered plea agreements and that information had been disclosed by the defense at trial, the result of Brown's proceeding would have been any different. *See, Doyle v. Director, TDCJ-CID*, 2011 WL 806029 (E.D.Tex. 2011).

The undersigned also finds that Brown's third claim of prosecutorial misconduct lacks merit. In that claim, Brown contends that the prosecutor should have informed the defense about his personal relationship with the victim prior to petitioner's trial in 2000. As evidence of that personal relationship, Brown refers to the fact that the victim apparently served as a pallbearer at the funeral of the prosecutor's wife seven (7) years after the trial,

---

[36] Evidence concerning Brown's presence at Roberts' house and any actions that he took while there was most significant to the State's burden of proving its case of attempted second degree murder against Brown. Rizen's testimony contributed nothing in that regard. Thus, impeaching his credibility with evidence that he entered a plea deal with the State would not have placed "the whole case [against Brown] in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

in 2007. Even assuming that fact is true, however, it does not demonstrate that the prosecutor himself and the victim had a personal relationship, and even if they did, it does not indicate that such personal relationship existed at the time of petitioner's 2000 trial such that the fact could have been disclosed to the defense at that time.

Finally, Brown has asserted a claim that his failure to state specific facts in support of his prosecutorial misconduct claim during post-conviction proceedings in state court was not an adequate reason to deny relief and that the state court should have granted him a hearing. Pursuant to La.C.Cr.P. art. 930, an evidentiary hearing for the taking of testimony or other evidence shall only be ordered, during post-conviction relief proceedings, when there are questions of fact that cannot properly be resolved under the procedures set forth in La.C.Cr.P. arts. 928 (dismissal upon the pleadings) and 929 (summary disposition). Even though the state trial judge based his decision, in part, upon the fact that Brown failed to carry his burden of proving the ring's existence (a factual finding that Brown could have attempted to prove if an evidentiary hearing had occurred), the failure to grant an evidentiary hearing on that issue does not result in a granting of petitioner's *Brady* claim or in the granting of an evidentiary hearing on that claim in this Court. That is because, even assuming Brown could establish the ring's existence in the woods, as discussed above, there is not a reasonable probability that such established fact would undermine the outcome of his case. Accordingly, Brown's claims concerning the alleged *Brady* violations by the prosecution and the state trial judge's purported errors related thereto should be denied.

**(F)      Petitioner's right to testify:**

Relative to this claim, in his post-conviction relief application, Brown simply alleged that he "attempted to testify in his own defense but was told by retained counsel that he was not allowed."  The state trial judge denied this claim for a failure to provide any facts in support of the allegation.  Additionally, the state trial judge found that a review of the record did not indicate any request by petitioner to testify on his own behalf, nor did it reveal any disagreement between petitioner and his counsel as to whether he should testify, and as a result, the claim had no merit.  This Court's review of the trial record indicates that the state trial judge's assessment in that regard was correct.

Morever, despite the state trial judge's determination that Brown failed to present sufficient supporting facts relative to this claim, Brown has not offered herein any additional facts or supporting evidence (such as an affidavit by his state trial counsel relating to the facts underlying this claim).  Instead, Brown simply argues, in his habeas petition, that counsel's "advice" denied him the opportunity to explain his whereabouts during the commission of the crime, which he contends was evidence "critical" to dispute the victim's uncontroverted identification of him as the perpetrator.  Brown has not supplied this Court with any factual details concerning the conversations that he allegedly had with his trial counsel about testifying at trial sufficient to warrant a hearing on this issue.  Furthermore, he has not cited to any clearly established federal law that the state trial judge violated or unreasonably applied in deciding not to grant petitioner relief and/or to allow him to have an evidentiary hearing on this issue.[37]  Accordingly, this claim is also subject to dismissal.[38]

---

[37] Upon federal habeas review, a claim that a criminal defendant was denied his right to testify at trial as a result of his trial counsel's actions is governed by the legal standard set forth in *Strickland.  U.S. Farahkhan*, 254 F.3d 70 (5th Cir. 2001).  The Fifth Circuit has specifically held that, in order to prevail on the prejudice prong of an ineffective assistance of counsel claim based upon a denial of the defendant's

## (G) Non-unanimous jury conviction violating rights to jury trial and due process:

As discussed in the undersigned's Report and Recommendation dated February 22, 2011, this claim should be denied because Brown has conceded that the claim was not properly presented to the state courts and, moreover, that the Louisiana Supreme Court has "recently and repeatedly affirmed the constitutionality of the non-unanimous verdict."

---

right to testify, the petitioner must show that the error by counsel was so serious as to "render[ ] the result of the trial unreliable or the proceeding fundamentally unfair." *Bell v. Quarterman*, 2009 WL 2391575, **1 (5th Cir. 2009), quoting *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993); *Graham v. Roberts*, 1996 WL 512222 (5th Cir. 1996)(applying a harmless error/prejudice standard to habeas petitioner's ineffective assistance of counsel claim based on a denial of the right to testify).  In addition to failing to present facts/evidence substantiating that his counsel actually denied him the right to testify, Brown has also failed to sufficiently demonstrate that the result of his trial is rendered unreliable because he was not able to testify as to his whereabouts at the time of the crime.

[38] The state trial judge's decision concerning this claim during post-conviction relief proceedings is supported by the Louisiana Third Circuit Court of Appeals' decision in *State v. Valrie*, 597 So.2d 1218 (La. App. 3 Cir. 1992).  In that case, a state court defendant contended that his right to testify on his own behalf was violated by his counsel's independent decision to withhold his testimony during a suppression hearing.  In support of his argument, the petitioner offered a sworn affidavit by his attorney, wherein she stated ". . . it was her decision and her decision alone not to have [the defendant] testify."  Despite that sworn affidavit, which is more than Brown offered to the state trial court during his post-conviction proceedings in the present case, the Third Circuit nevertheless held that the petitioner was not entitled to a reopening of the suppression hearing to testify on his own behalf.  The court of appeals explained that there was no evidence in the record to suggest that, at the time of the suppression hearing, the petitioner desired to testify.  Additionally, the court noted that the attorney's affidavit did not indicate that her decision was made over the private objection of the petitioner, and there was nothing to indicate that, at the hearing itself, the petitioner in any way expressed a desire to testify on his own behalf, or that he was precluded from doing so by the unilateral act of his attorney.  Although the Third Circuit recognized that the decision to withhold testimony is solely the defendant's, it nevertheless found that the defendant/petitioner had not presented sufficient evidence to support a finding that his constitutional right to testify had been infringed upon.  While the tactical decision not to testify made by the defendant on the advice of counsel had not produced the desired result because the motion to suppress had been denied, the court found that the defendant could not "now complain based solely on his attorney's affidavit when there is no evidence in the record indicating that he desired to testify in the first place." *Id.,* at 1222.

With even fewer factual allegations before it than the court had in *Valrie* and absolutely no evidence, the state trial judge in Brown's case appropriately examined the state court record to determine whether there was any suggestion therein that Brown had expressed a desire to testify at trial or that he was precluded from doing so by the unilateral act of his counsel, and finding none, the state trial judge properly denied Brown's claim.

**(H)     Denial of Presumption of Innocence by Use of Excessive Security Measures:**

In his amended habeas petition, Brown asserts his final claim that he was denied the presumption of innocence due to the use of excessive security measures that undermined the fairness of the fact-finding process and exposed the jury to unjustified indications that he posed a safety risk.  Specifically, he complains that actions of deputies of the trial court led jurors to believe that he was dangerous.  As evidence supporting that assertion, he first refers to the affidavit of one of the jurors, Donna Chance ("Chance"), who attested that "[t]he police mentioned Mr. Brown as a safety risk" and that an officer followed her home after the first day of trial for her safety.  *See,* Exhibit 12 to proffer.  Brown also refers to an affidavit by a non-juror, Orjuela (the investigator for the defense), who attested that he met with an alternate juror, Bosworth, who informed him that, during the trial, jurors "sometimes saw Mr. Brown wearing his prison garb."  *See*, Exhibit 16 to proffer.

As to Orjuela's affidavit, it cannot serve as competent evidence in support of this claim because it is based upon inadmissible hearsay.  Furthermore, even if such hearsay evidence could be considered, it does not demonstrate that the alleged security measures taken relative to Brown impacted the fairness of his trial and the jury's verdict since the hearsay evidence is derived from an alternate juror who did not even participate in the jury's deliberations and verdict.  Additionally, while trying a defendant in prison clothing may infringe upon a fundamental right to the presumption of innocence, that right is only infringed if the state "compels" a defendant to *stand trial* before a jury in prison dress. *Thomas v. Ieyoub*, 26 F.3d 1119 (5th Cir. 1994)(Emphasis added).  The right is not infringed if the jury briefly and/or inadvertently sees the defendant in his prison clothing.  *Id.* (holding that presumption of innocence was not violated where defendant was not dressed in prison

garb the entire trial but instead the jury only might have seen him in prison garb briefly before the trial commenced because the clothes in which the defendant had been arrested could not be loacted)*; U.S. v. Birdsell*, 775 F.2d 645, 652 (5th Cir. 1985), *cert. denied*, 106 S.Ct. 1979 (1986); *Wright v. State of Texas*, 533 F.2d 185, 187 (5th Cir. 1976)(reiterating that a brief encounter of the defendant in handcuffs by jurors is not prejudicial without an affirmative showing otherwise).[39]  In the present case, while Orjuela's affidavit indicates that he was told by Bosworth that the jury saw Brown in prison clothes, it does not indicate that Brown stood trial in prison clothes.  Moreover, Chance's affidavit indicates that Brown wore a grey suit during trial.  Accordingly, Brown's presumption of innocence was not violated in that respect.

Finally, as to the contentions asserted in Chance's affidavit, although the undersigned could not locate any cases on point, where a security officer followed a juror home for safety, several cases were located involving situations where jurors were escorted to their vehicles by officers for their security, and such measure was not considered to be a violation of the presumption of innocence, absent a showing of "actual prejudice."  For

---

[39] *See also, King v. Lynaugh*, 828 F.2d 257 (5th Cir. 1987)(Brief and inadvertent exposure of two jurors to defendant in handcuffs when fire broke out in courthouse and all present were required to be evacuated was not so inherently prejudicial to require a new trial on the ground that the incident deprived the defendant of an impartial jury and undermined his right to the presumption of innocence); *Ford v. Schofield*, 488 F.Supp.2d 1258 (N.D.Ga. 2007)("The 'brief sighting' of an accused in handcuffs is not per se prejudicial."  Since clearly established federal law does not dictate that it is inherently prejudicial for jurors to briefly and inadvertently observe a defendant in handcuffs while being escorted out of the courthouse, a defendant must show actual prejudice); *United States v. Diecidue*, 603 F.wd 535, 549 (5th Cir. 1979)("The conditions under which defendants were seen were routine security measures rather than situations of unusual restraint such as shackling of defendants during trial" and, thus, defendant was required to show actual prejudice").

Bosworth's general statement that the jury "sometimes" saw Brown in his prison garb does not provide sufficient detail as to the frequency and extent of the jury's viewing of Brown in his prison garb to lead to a finding of per se prejudice.  There is no evidence to suggest that such instances were anything other than the types of brief and inadvertent sightings discussed in the above cases.  Furthermore, Brown has failed to show that he was "actually prejudiced" by the jury "sometimes" seeing him in his prison clothes.

example, in *U.S. v. Walden*, 12 F.3d 1110 (9th Cir. 1993), the petitioner contended that he was denied a fair trial when the district court ordered U.S. Marshals to escort jurors from the jury room to their cars. Citing U.S. Supreme Court precedent, the court explained that security measures only violate a defendant's right to a fair trial if they are "inherently prejudicial" or cause "actual prejudice." *Id.*, at *1, citing *Holbrook v. Flynn*, 475 U.S. 560, 572 (1986). The court held that, unlike inherently prejudicial practices, a jury escort is open to "a wide[ ] range of inferences." *Id.* The court found that the jurors likely inferred that the U.S. Marshals escorted them to their cars to protect them from street crime, not from the defendant. Since the jury had "no reason . . . to infer that [the petitioner] specifically was the reason for [the jury escort]," the escort was not inherently prejudicial." *Id.* The petitioner also argued that the escort was particularly prejudicial because it was not initiated until the fourth day of trial. The court, however, employed the Supreme Court's comment from *Holbrook* and found that, "Even had the jurors been aware that the deployment of troopers was not common practice . . ., we cannot believe that the use of the [ ] four troopers tended to brand respondent in their eyes 'with an unmistakable mark of guilt'." *Id.*, at *2, citing *Holbrook*, at 571.

In *U.S. ex rel Aleman v. Sternes*, 205 F.Supp.2d 906 (N.D.Ill. 2002), a habeas petitioner asserted that his right to a fair and impartial jury was violated because the jury was subjected to heightened security, in that sheriffs escorted the jury under heavy guard, sheriffs blocked the streets in front of the courthouse when jurors left, the stairwell next to the courtroom was sealed off with police tape, and "all activity in the courthouse came to a standstill when" the defendants were escorted into the courthouse. *Id.*, at 913-14. On habeas review, the federal district court explained that it has a limited role in determining

the extent of measures permitted in furtherance of a state's essential interest in courtroom security. *Id.*, at 914. Furthermore, a state trial judge has wide discretion in determining necessary security measures. *Id.* The federal district court concluded that the record did not support the habeas petitioner's characterization of security measures and that the escort of the jury by deputy sheriffs was not prejudicial, citing the U.S. Supreme Court's decision in *Holbrook*. The court further held that the petitioner had failed to advance evidence that the jury was influenced by the security measures, and as a result, his habeas claim challenging the imposition of such security measures lacked merit.[40] The court also noted that a hearing is only necessary regarding the issue of court-imposed security measures when a defendant presents more than speculation about jury impartiality. *Id.*, citing *Whitehead v. Cowan*, 263 F.3d 708, 722 (7th Cir. 2001).

In the present case, Brown has not presented evidence demonstrating that the fact that one juror was followed home by a security officer on one occasion following trial was inherently prejudicial or caused him actual prejudice. There is no evidence before the Court indicating that any juror, other than Chance, was aware that a security officer followed her home on one occasion. Furthermore, as the courts in *Walden* and *Aleman* noted, the fact that Chance was followed home by security officers is open to a "wide range of inferences." No evidence has been presented that Chance or any other juror was told that Chance was followed home because of a danger posed by Brown.[41] Considering the

---

[40] *See also, U.S. v. Urso*, 2006 WL 1210868 (E.D.N.Y. 2006)(granting the government's motion requiring that, from the time each juror is empaneled until the conclusion of the trial, jurors be escorted by U.S. Marshals to and from the courthouse each day and at all times during recesses on the basis that the defendant had a history of obstruction of justice and trial evidence would depict a pattern of violence that could cause a juror to reasonably fear for his or her own safety).

[41] Moreover, there is no evidence that any other juror overheard the alleged statement by a security officer that Brown posed a "security risk."

wide discretion accorded to state trial courts in imposing security measures, a federal habeas court's limited role in determining the extent of measures permitted in furtherance of a state's essential interest in courtroom security, and the complete lack of evidence that the alleged security measures taken in Brown's case (and/or the alleged statement made by a police officer that Brown was a "safety risk") had any influence upon the jury's verdict,[42] the undersigned cannot find that the use of the alleged security measures "tended to brand [Brown] in the [jurors'] eyes 'with an unmistakable mark of guilt'," as would be required to find that such measures violated his presumption of innocence. Finally, Brown is not entitled to a hearing relative to the security measures issue since he has not presented anything more than mere speculation that such measures impacted jury impartiality. Accordingly, this final claim should also be denied.[43]

## RECOMMENDATION

For the above reasons, it is recommended that the Petition for Writ of Habeas Corpus (R. Doc. 1) and the Amendment to Petition for Writ of Habeas Corpus (R. Doc. 4) filed by petitioner, Gregory Brown, should be **DISMISSED WITH PREJUDICE**.

Signed in chambers in Baton Rouge, Louisiana, November 22, 2011.

_____

**MAGISTRATE JUDGE CHRISTINE NOLAND**

---

[42] Chance does not even attest that the alleged statement by the police officer or the fact that she was followed home impacted her decision as to whether or not Brown was guilty.

[43] Because the undersigned has found that none of Brown's claims allege facts that, if proven, would entitle him to habeas relief, he is not entitled to an evidentiary hearing concerning his claims. *Staples v. Keffer*, 2011 WL 989818 (5th Cir. 2011), citing *Ellis v. Lynaugh*, 873 F.2d 830, 840 (5th Cir. 1998); Footnote 6, *supra*.